254 N.J. Super. 591 (1992)
604 A.2d 158
RITA J. CONNOR, PLAINTIFF-RESPONDENT,
v.
WILLIAM J. CONNOR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 1991.
Decided March 9, 1992.
*592 Before Judges ANTELL, LONG and BAIME.
Arthur H. Garvin, III argued the cause for appellant/cross-respondent William J. Connor (Kerby, Cooper, English, Danis, Popper & Garvin, attorneys).
Neil Braun argued the cause for respondent/cross-appellant Rita J. Connor (Gourvitz, Diamond, Hodes, Braun & Diamond, attorneys).
The opinion of the court was delivered by LONG, J.A.D.

I
After a 22 year marriage, plaintiff, Rita J. Connor and defendant, William J. Connor were divorced pursuant to a final *593 judgment entered on December 9, 1987. That judgment incorporated a property settlement agreement which distributed the marital property and provided for certain alimony and equitable distribution payments from defendant to plaintiff.
Defendant was to pay alimony from 1988 to 2002 according to the following schedule:

 Year: Amount:
 1988 $170,000
 1989 $160,000
 1990 $155,000
 1991-1994 $150,000
 1995-2002 $ 50,000

The payments were to run continuously until the death of a party, remarriage of the wife or until the natural termination of the schedule in 2002. The agreement also provided for defendant to pay $2,500 annually as additional alimony for plaintiff's ongoing periodontal work up to 1994 and to pay for plaintiff's health insurance plan for three years.
The parties' assets and liabilities were valued and divided as follows:

*594
 Assets:
 Husband Wife
 Cash $ 72,000 $ 92,000
 Furniture $ 0 $ 31,400
 David Clark Loan $ 50,000 $ 50,000
 Shares ITB $ 200 $ 0
 (Indecipherable) $ 2,000 $ 0
 Savings Bonds $ 100 $ 0
 Cadillac Seville $ 13,000
 IRA (husband) $ 11,800
 IRA (wife) $ 9,800
 Pension $ 415,000 $ 415,000
 Murray Hill Sq. Home $ 340,000
 Florida Condo $ 70,000
 Lyndhurst $ 175,000
 Calyco $ 62,000
 TWP $1,500,000
 Clifford Trust $ 20,000 $ 20,000
 ______________ __________ __________
 Total: $2,203,100 $1,146,000
 Liabilities:
 Husband Wife
 Cadillac Seville $ 10,000
 Student Loan $ 3,000
 Mortgage Murray $ 198,000
 Hill Square $ 44,000
 Florida Condo $ 50,000
 Lyndhurst $ 65,000
 ______________ __________ __________
 Total: $ 50,000 $ 320,000

Plaintiff also was to receive $200,000 in equitable distribution payments. The agreement provided that defendant would pay the $200,000 as follows:
*595 (1) $10,000 on or before April 15, 1988; however,
If he shall be unable to make the said $10,000 payment on or before April 15, 1988, the wife by this agreement shall be estopped from bringing an action to enforce the said payment and for sanctions of any nature whatsoever including contempt, legal fees and cost;
(2) $20,000 between January 1, 1989 and December 31, 1989;
(3) $55,000 between January 1, 1990 and December 31, 1990;
(4) $50,000 between January 1, 1991 and December 31, 1991;
(5) $50,000 between January 1, 1992 and December 31, 1992;
(6) $25,000 between January 1, 1993 and December 31, 1993;
If the husband shall have paid the $10,000 payment due on or before April 15, 1988, he may take a credit for same against any payment required to be made pursuant to this paragraph for the years 1991 through 1993.
The property settlement agreement was executed on December 24, 1987. By August 1988, defendant had begun to fall behind on the agreed upon payments. In a motion for enforcement of litigant's rights dated September 21, 1988, plaintiff related that defendant's payments were already $21,573 in arrears. (By December 1990, defendant was over $300,000 in arrears). In a cross-motion, defendant asked the trial judge to forgive the arrearages and to reduce his total alimony obligation to $2,500 per month based upon changed circumstances; to wit, a significant reduction in the profitability of his telecommunications business as a result of the competition. He urged that plaintiff had the ability to live off her liquid assets, equitable distribution, and her "ability to go out and work." At the time of this motion, plaintiff was 56 years old.
On December 19, 1988, the trial judge ordered a plenary hearing; fixed alimony arrears; ordered the immediate payments of $10,000; allowed plaintiff to seek interest on the arrearage during the plenary hearing; reserved decision regarding the $2,500 in dental alimony until the time of the *596 hearing; ordered defendant to pay $1,523 toward plaintiff's health insurance, and ordered defendant to pay plaintiff $5,000 per month as alimony until such time as the cross-motion could be adjudicated at the plenary hearing. The judge also ordered that alimony of approximately $9,000 would accrue in arrears until final disposition of the matter. Discovery was to be completed by April 14, 1989.
On April 14, 1989 defendant moved to modify and/or terminate his obligations under the court's order of December 19, 1988. He also moved to terminate his health insurance obligation and his $2,500 dental obligation. The judge reserved decision on defendant's motion until the plenary hearing. Plaintiff subsequently moved to enforce litigant's rights to compel the defendant to comply with the court's December 19, 1988 order. Plaintiff's motion was based upon defendant's refusal from April 1989 to pay any support.
On August 4, 1989 the trial judge ordered the defendant to pay $10,000 by a time certain; failing payment, a bench warrant would issue for his arrest. The judge further ordered an additional sum of $10,000 and two sums of $5,000 to be paid by the same deadline. He denied defendant's oral application for a stay. Defendant unsuccessfully moved before us for emergent relief.
On October 13, 1989, the trial judge entered an order directing that defendant provide plaintiff with tax returns; that defendant continue to pay $5,000 per month in alimony pending the plenary hearing, and ordered defendant's partners and new wife to provide a 1989 tax return before the hearing. The hearing was adjourned several times and eventually took place in September and October, 1990. In the interim, the matter was not fallow. A series of applications were made resulting in orders for payment which were not obeyed.
At the hearing, among the facts adduced were the following: Defendant left the sales division of Western Union in 1979 to start his own telecommunications business, Telegraphic Word *597 Processing, Inc. (Telegraphic) with two co-workers, Robert Carton and Robert Lyons. The partnership also owned two other companies: TWP, Inc. which lasted from 1986 to 1989 and Calyco, Inc., which owned the condominium from which Telegraphic operated. Each partner shared one third of the business.
Initially, Telegraphic prospered. Banks comprised approximately 85 to 90% of the clientele. The remaining clients were either small customers or advertising companies seeking to transmit commercial announcements. Defendant described the overall business as "volatile" because there was no way to project how much business it would do each month.
During the first year of the agreement, defendant's business began to decline. Telegraphic's major competitor, MCI, set up a telecommunications department within its company which mirrored Telegraphic's. As a result, Telegraphic lost one of its major customers to MCI. In addition, the advent of the fax machine also took its toll. Telegraphic's customers, especially banks, no longer needed outside help to communicate with the business community. As a result, Telegraphic began to offer a fax business to most of its customers.
In 1988 Telegraphic terminated two pension plans. Defendant received $864,000 in late 1988 from one plan and $108,000 from the second in 1989. Plaintiff received half of each amount (i.e. $432,000 and $54,000) pursuant to the property settlement agreement. Defendant's income for 1988 was $320,000.
Defendant testified that business was hit the hardest in 1989. Business declined approximately one third in 1988 and another one third in 1989. For nine months in 1990, business declined to 32,000 telecommunications per month. (In 1987, it had been 110,000 per month). In turn, this decline in business caused profits to reduce dramatically. The partners' profits dropped to an all time low of $4,500. Accountants, as well as each partner of Telegraphic similarly described the dramatic decline in business and profits.
*598 Defendant's only other source of cash was $50,000 he withdrew from the $54,000 he received from the corporate pension plan that was rolled over. Defendant paid a 10% tax penalty for early withdrawal. Defendant did not seek any additional employment to supplement his income.
Plaintiff testified that her alimony could not be reduced and still meet her $16,000 to $17,000 monthly expenses. (According to plaintiff's Case Information Statement dated June 2, 1989, her monthly expenses totaled $14,658. At trial she testified to expenses of $16,622). She stated that she was forced to make early withdrawals from her IRAs "[b]ecause [she] wasn't receiving the right amount of alimony and had to pay [her] bills." She paid a 10% tax penalty for early withdrawal and "never would have accepted all the liabilities" under the agreement if she "wasn't relying on the alimony to pay them." The principal liability to which plaintiff referred was the mortgage on the Murray Hill Square house.
Benjamin Block, plaintiff's accountant, testified that defendant paid approximately $137,000 of alimony in 1988. During that year, plaintiff was forced to withdraw $35,000 from her $432,000 IRA. In the next year, plaintiff rolled over $45,000 of her $54,000 IRA. In addition, Block testified that plaintiff withdrew an additional $85,000 from her IRA which contained the original $432,000 from the pension plan minus the 1988 withdrawal of $35,000. Other than that, plaintiff received $60,000 from defendant.
During the hearing, the trial judge noted without disagreement from either party that the alimony payments were actually a method of equalizing equitable distribution. It was also conceded by the parties that the alimony and equitable distribution aspects of the agreement were, in fact, interrelated. Plaintiff described the operation of the agreement this way:
A. Yes. The whole concept was based on the distribution of the pension money. I was supposed to put the pension money into investments, into an IRA, and leave it untouched until the eighth year. The eighth year was when *599 my alimony would drop dramatically. And in the eighth year I would start making withdrawals to help me maintain my lifestyle.
Q. Is there any significance to this eight-year period that you recall? How old were you at the time in December of '87? How old are you now?
A. I'm 59 now. I was 59 in August.
Q. Was there any significance to the eight-year period in terms of your age or your husband's age that you recall, or was it tied into the alimony?
A. I was very upset that the alimony would stop in 15 years at the point in my life when I will probably need it  some security. I hope I'm not going to be dead at that time, my life will go on. But, no, I was upset about it ending in 15 years.
Q. Under the judgment, it dropped from $150,000 a year which was to be 1991 and '94 to $50,000 a year commencing in '85.
A. Yes.
Q. So then the way the deal was structured was he paid $170,000, $160,000, 155,000, 150,000 a year through 1994. And then at that point in time it dropped to $50,000. And it was explained to you that you would then begin using your pension monies, correct?
A. That's right.
After the hearing, the trial judge found that defendant had indeed undergone changed circumstances and entered an order directing that defendant pay $13,823 as alimony arrears for the calendar year 1988 on or before December 31, 1990; fixing defendant's alimony obligation at a minimum of $30,000 annually which he based upon defendant's imputed earned income of $100,000; (if the income exceeded $100,000 plaintiff was to receive the equivalent of 30% of the amount above $100,000 plus the $30,000 up to the maximum of $170,000); crediting defendant with $10,000 worth of payments in 1989; ordering defendant to pay additional alimony of $7,500 on or before December 31, 1990; ordering defendant to pay $4,775 on or before December 31, 1990; denying plaintiff's application for additional distribution under the corporation's pension plan; denying defendant's application to adjust and change the payment schedule of his equitable distribution; ordering defendant to submit his W-2 forms showing his gross earned income to plaintiff and the court annually, and ordering a scheme for the payment of alimony.
*600 On January 24, 1991 defendant filed a Notice of Appeal and plaintiff thereafter filed a notice of cross-appeal. Predictably, the gravamen of defendant's appeal is that the trial judge abused his discretion in refusing to give him greater reductions. Contrariwise, plaintiff argues that the trial judge abused his discretion in the reductions he made. Plaintiff also argues that she did not receive her fair share of the assets under the distribution scheme in the original agreement and that it should therefore be set aside.
We think that all of these arguments are wide of the mark. This is not to suggest that we agree with the trial judge's approach to the case. Certainly, the time between the filing of the motions and the plenary hearing (two years) was unreasonably long. In some cases, the delay would merely be an aggravation. In this case, with the passage of each day and plaintiff's continuous tapping of her IRAs, the solution to the matter became more complicated.
More importantly, we part company from the trial judge insofar as his modification of the so-called alimony is concerned. According to the accountant's balance sheet in equitable distribution, defendant received $2,153,000 and plaintiff received $826,200. Plaintiff was also to receive a $200,000 equitable distribution payment bringing her to a total of $1,026,200. As the trial judge correctly found and as is obvious from these numbers, the aggregate alimony of $1,435,000 included plaintiff's residual entitlement to equitable distribution. In order for plaintiff to receive 50 percent of the marital assets (which was probably the distribution rationale after a 22 year marriage) over $1,000,000 worth of the alimony payments were really her share of equitable distribution. The schedule was likely fashioned to even up distribution in the face of a lack of liquidity in defendant's businesses and to give him a tax break by denominating the equitable distribution as alimony. Whatever the reason one thing is clear  a substantial portion of the *601 so-called alimony payments were not alimony but equitable distribution.

II
This brings us to the question of how an application for substantive modification of a negotiated equitable distribution scheme should be viewed. We have previously said that such an application may be made pursuant to R. 4:50-1(f). Rosen v. Rosen, 225 N.J. Super. 33, 541 A.2d 716 (App.Div. 1988), certif. denied, 111 N.J. 649, 546 A.2d 558 (1988); Edgerton v. Edgerton, 203 N.J. Super. 160, 496 A.2d 366 (App.Div. 1985). The R. 4:50-1(f) standard requires a showing of fraud, misconduct or mistake in the negotiations or a showing of fundamental inequity or unfairness in the agreement. Edgerton, supra; Berlin v. Berlin, 200 N.J. Super. 275, 491 A.2d 63 (Ch.Div. 1984). Relief is not available absent exceptional and compelling circumstances. Schwartzman v. Schwartzman, 248 N.J. Super. 73, 77, 590 A.2d 246 (App.Div. 1991) (citing Baumann v. Marinaro, 95 N.J. 380, 392, 471 A.2d 395 (1984)); Castiglioni v. Castiglioni, 192 N.J. Super. 594, 471 A.2d 809 (Ch.Div. 1984). This is quite different from the changed circumstances standard of Lepis v. Lepis, 83 N.J. 139, 145-49, 416 A.2d 45 (1980) which only applies to the modification of support. Schwartzman, 248 N.J. Super. at 77, 590 A.2d 246; Rosen, 225 N.J. Super. at 36, 541 A.2d 716.
As the trial judge correctly recognized, a change in financial circumstances standing alone does not satisfy the R. 4:50-1(f) standard. Here, defendant's sole basis for a modification of the so-called alimony portion of the agreement was changed circumstances. No argument even obliquely implicating R. 4:50-1(f) was advanced by defendant with respect to the alimony. (He did raise a R. 4:50-1 claim on his application to modify the schedule for the $200,000 equitable distribution payout). Thus, there is no basis in the record for the modification of any of the equitable distribution portion of defendant's alimony payments.
*602 This is an important point. If, as in ordinary circumstances, these parties had had sufficient liquidity to effect distribution, or if defendant had borrowed against his businesses and paid plaintiff off, the distribution to which plaintiff was entitled as a 22 year partner in this marriage would have been fait accompli and not subject to the vicissitudes of defendant's financial fortunes. The mere fact that distribution here is taking place pursuant to a different method does not affect the inviolability of plaintiff's entitlement. Had the value of defendant's business skyrocketed, no one would suggest that an additur be arranged for plaintiff based upon his enhanced circumstances. The opposite rule should also hold. Unlike alimony, which is directly related to the ability to pay, equitable distribution is simply an allocation of the assets amassed in the past due to the joint efforts of the parties. A later change in a party's financial life is essentially irrelevant to that allocation and is no basis for modification. Plaintiff's entitlement to the equitable distribution portion of the alimony is thus absolute.
We hold that in a case such as this, the trial judge must make a specific preliminary determination as to the distribution rationale and declare what portion of the alimony, if any, is equitable distribution. He then must limit the application of the changed circumstances modification to the alimony portion. We thus reverse and remand the case to the trial judge for this purpose.
On remand, the parties may offer evidence to the judge to assist in this determination. The judge may also consider altering the payment schedule of the equitable distribution in recognition of defendant's cash flow problems. See Rosen v. Rosen, supra; R. 4:50-1(f). Such a remedy is available because the important policy considerations which support the inviolability of an equitable distribution award do not necessarily apply where the issue is not whether the payee spouse will receive her entitlement but how that entitlement is to be conveyed. However, any change in the schedule must not contravene the *603 original intent of the parties. Whatever alteration takes place must account for the fact that this agreement was footed on the integrity of the pension moneys placed in plaintiff's IRA, moneys which the alimony schedule contemplated would be available for her to tap in the eighth year of the schedule. Any resolution should carry out the intent of the agreement and place plaintiff in the position she would have been in had the motion not been made. This means that in 1995, the year plaintiff is entitled to begin obtaining payments from her IRA, that fund should either be equal to what it would have been had defendant lived up to the agreement or the money she would have received from the IRA should be available to her in some other form. The reason for this is that, as both parties concede, the agreement was formulated to give plaintiff, who was 56 years old at the time of the divorce, security for life. The alimony and equitable distribution provisions were part of a unitary scheme negotiated and agreed upon for that purpose. It was tailored to plaintiff's age and the payment schedule was directly related to her ability to tap the pension moneys in eight years. This should be the focus of the trial judge in assessing whether any schedule modifications should be allowed and in evaluating the application for a modification of the actual alimony payments. (We note that in a case in which the payee spouse has experienced a substantial improvement in his or her financial fortunes, the trial judge will have significantly more latitude in reforming the distribution scheme although the entitlement will remain absolute.)
We affirm the trial judge's refusal to allow defendant to "equalize" pension contributions from plaintiff pursuant to an agreement to which she was not a party. His conclusions as to this issue are adequately supported by the evidence. R. 2:11-3(e)(1)(A). On this record we also affirm the trial judge's refusal to require a Qualified Domestic Relations Order (QDRO) as a vehicle for equitable distribution out of defendant's IRA. Whether such an order will be viable as the case *604 unfolds will depend on the final details of the payment schedule.
Finally, we note that we are puzzled by the judge's apparent acceptance of plaintiff's $16,622 monthly budget and her claim that she was required to expend a large portion of her IRA for living expenses. Her budget, like her claims to have spent $500,000 on her expenses over three years, seems grossly out of line to us in light of the fact that her budget was obviously constructed as justification for the alimony award which we have previously ruled was primarily equitable distribution. In assessing defendant's responsibility for the depletion of plaintiff's IRA, the trial judge should evaluate the legitimacy of plaintiff's resort to that fund in light of the amount of cash she actually received and her legitimate expenses.
It goes without saying that the final alimony order in this case should take into consideration the real facts and circumstances of each party's financial situation including actual income, expenses, support from other sources and potential earning capacity. Income should not be imputed where real figures are available. No rule of thumb or percentage should be applied. Di Tolvo v. Di Tolvo, 131 N.J. Super. 72, 328 A.2d 625 (App.Div. 1974). Such mechanisms have no place in judicial decisionmaking.
Reversed and remanded.