703 A.2d 385

C.R., PLAINTIFF, v. J.G., DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Hudson County

Decided April 17, 1997.

*Claudette L. St. Romain,* Hudson County Legal Services, for plaintiff, C.R.

*Juan Guillermo Espinosa,* for defendant, J.G.

HUNTER, J.S.C.

The issue presented by this case is whether complainant may be granted an order for a human leucocyte antigen (HLA) test to establish paternity when paternity has been already acknowledged and admitted as memorialized in a divorce judgment and in judicial orders. For the reasons detailed below, the court denies the motion for a blood test.

The facts of this case are as follows:

Plaintiff C.R. gave birth to two sons: one on October 11, 1979 and the other October 12, 1983. Complainant J.G. claims he has reason to believe the second child (hereinafter the child) is not his and moves for an order for C.R. and the child, along with himself, to take a blood test to establish paternity, and in case J.G. is shown not to be the biological father, for an order ceasing child support payments. J.G. does not dispute the paternity of the eldest child.

On January 25, 1984, Hudson County Division of Welfare, on behalf of C.R., filed a complaint to establish paternity and for child

support for both children. On May 7, 1984 the complaint was dismissed for lack of prosecution without prejudice.

The parties married on July 20, 1984 and separated in about a year. C.R. filed a complaint for child support which resulted in an April 24, 1985 order stating a hearing was held; sets a sum of $25 a week per child in child support, payable to the Hudson County Probation Office; schedules visitation on alternate weekends, says "paternity admitted—order of filiation", and is signed by J.G.

On July 15, 1985, C.R. moved to amend support and visitation with the child, stating that Defendant had "minimal contact" with the child; consequently it would be injurious to the child to sustain off premise or overnight visits with J.G. The certification also states that the parties lived together from the time the child was four or five months old until February or March of 1984; that J.G. left C.R. and the children; and since leaving had "rare" contact with the child, and kept himself separate from the child, but had "substantial contact" with the older child.

A July 25, 1985 order states the matter was before the court on April 24, 1985, recites that J.G. acknowledges paternity of the child and recites "adjudged that [J.G.], defendant herein, is the father of said [the name of the child]." A separate order of July 25, 1985, states the same information in regard to the older son.

In March of 1987, J.G. filed a divorce complaint which states there are two children born of the marriage, there was a previous order of child support, wherein paternity was admitted, and asks for visitation with the infant issue of the marriage.

On September 5, 1987, J.G. obtained by default a judgment of divorce, which granted J.G. visitation with the infant issue of the marriage and ordered $50 a week child support.

On January 29, 1996, the parties appeared before a hearing officer on a motion to enforce child support. The resulting order dismissed the motion for enforcement of child support, put the payment of child support monies on hold; referred issues of custody, visitation and paternity to a judge; stated that J.G. was

advised to file a formal motion on the issue of paternity; and recited that according to his mother the child was at that time in Columbia, South America.

Complainant J.G. claims that the child is not biologically his. Attached to the certification accompanying his motion, filed September 9, 1996, is a letter dated August 1, 1995 addressed to the Hudson County Probation Department in which he states that the child has been out of the country since 1993 and has been living in Columbia with his "real father and grandparents." J.G. also certifies that the older child "recently" told J.G. that he is not the child's father and that he, the older child, was told this by C.R. The certification also states that the child has been in Colombia since July of 1995, and that the mother will not let J.G. see the child.

J.G., claiming he was defrauded into believing he was the father of the child, moves for an HLA blood test, and in the event the test reveals he is not the natural father, for an order ceasing support. C.R. opposes defendant's motion for testing on the grounds of res judicata; collateral estoppel; that defendant is barred from raising this issue since it was not raised at the time of divorce pursuant to *N.J.S.A.* 9:17–46(a) of the Uniform Parentage Act, *N.J.S.A.* 9:17–38, to –59; laches; judicial estoppel; and that the motion does not comport with the requirements of *R.* 4:50–1(c) or (f) for opening final judgments, in this case the divorce judgment and paternity adjudications.

Oral argument, on November 21, 1996, was attended by the parties and a representative from Hudson County Welfare who contended that a blood test should not be allowed because if it revealed that J.G. was not the father, the state would be burdened with the support of the child.

Two separate yet intertwined issues are presented here. The first is whether complainant should be allowed the blood test. The second is if the test shows he is not the biological father of the child, whether he should be allowed to stop paying child support.

At the outset, the court notes: J.G. has not told the court when he was informed he was not the father of the child, except that his certification says such information was "recently" obtained; and C.R. has nowhere stated that J.G. is the natural father of the child.

1. *Does complainant's motion present sufficient justification for a blood test?*

The Uniform Parentage Act expressly provides that a presumption of paternity may be rebutted. *N.J.S.A.* 9:17–43b. J.G. is a presumptive father; thus; the analysis of law will proceed according to the guidelines set down in the Act.

The procedure to declare the existence or nonexistence of a father and child relationship requires a consent conference to be held by the Superior Court, county probation department, or county welfare agency. *N.J.S.A.* 9:17–48(a). If a consent agreement cannot be reached and blood tests or genetic tests have not been taken, the court shall order such tests if it determines there is an "articulable reason" for suspecting the alleged father is the natural father. *N.J.S.A.* 9:17–48(d).

For the purposes of the present case, the articulable reason of *N.J.S.A.* 9:17–48d must address the claims of an individual who, without a blood test being taken, has previously admitted fatherhood, been adjudicated as such, and is also presumed to be the father.

Presumptions of paternity under the Uniform Parentage Act are addressed by *N.J.S.A.* 9:17–43. A man is presumed to be the natural father of a child if after the child's birth he and the child's natural mother marry and he openly holds out the child as his natural child, or is obligated to support the child under a written voluntary agreement or court order. *N.J.S.A.* 9:17–43a(3).

In addition, a man is presumed to be the father if he receives the child into his home and openly holds out the child as his natural child, *N.J.S.A.* 9:17–43a(4); or if while the child is under

the age of majority, he provides support for the child and openly holds out the child as his natural child. *N.J.S.A.* 9:17–43a(5).

J.G. is clearly presumed to be the father of the child, under *N.J.S.A.* 9:17–43a(3). He and C.R. married after the child was born and he is obligated to support the child under a court order.

A presumption of paternity may be rebutted only by clear and convincing evidence, and is rebutted by a court order terminating the presumed father's paternal rights or by establishing that another man is the child's natural or adoptive father. *N.J.S.A.* 9:17–43b.

■ A blood test is not automatic and it should be ordered only after a delicate balance of all circumstances surrounding the alleged paternity. *State v. Volk,* 280 *N.J.Super.* 57, 654 *A.*2d 500 (App.Div.1995); *N.M. v. J.G.,* 255 *N.J.Super.* 423, 433, 605 *A.*2d 709 (App.Div.1992).

■ A putative father could not be required to take a blood test, unless the presumption of the mother's former husband's paternity was rebutted, documentary submissions or testimony warranted the conclusion that there was articulable reason for suspecting the putative father's paternity, and the blood test was in the best interest of the child. *N.M. v. J.G., supra,* 255 *N.J.Super.* at 433–435, 605 *A.*2d 709; and *see Camden County v. Yocavitch,* 251 *N.J.Super.* 24, 32, 596 *A.*2d 769 (Ch.Div.1991).

The Appellate Division held that a man's request for HLA testing was barred because the child, now fifteen, had considered him as her father her entire life; and the man's conduct estopped him from denying paternity; that the issue was not only financial support for the child, but also an established parent-child relationship; and that it was not in the child's best interest to now upset this, there being no other father figure. *T.W. v. A.W.,* 224 *N.J.Super.* 675, 684–685, 541 *A.*2d 265 (App.Div.1988).

In *M.F. v. N.H.,* 252 *N.J.Super.* 420, 599 *A.*2d 1297 (App.Div. 1991), a man claiming to be the father and wishing to establish paternity, filed a complaint asking that the mother and child, born

during the mother's marriage to another man, submit to a blood test. Neither the mother or her husband disavowed the husband's paternity. The trial court ordered the test and the mother appealed.

■■■■ The Appellate Division stated there is a strong public policy favoring the preservation of the family when neither the mother nor the husband have in any way disavowed the husband's paternity of the child. Even though under the New Jersey statute, *N.J.S.A.* 9:17–45, any man alleging to be the father has the right to file a complaint, mere standing does not ensure him the right to obtain blood tests. *M.F. v. N.H., supra,* 252 *N.J.Super.* at 425, 599 *A.*2d 1297. The court held since there is a presumption that the husband is the father of the child, and since the husband has acknowledged paternity, before blood tests can be ordered, the trial court must find by clear and convincing evidence that establishing the plaintiff's paternity and rebutting the husband's paternity will serve the best interests of the child. *Id.* at 426–427, 429, 599 *A.*2d 1297.

■■■■ Determination of the child's best interests must be based upon a consideration of all factors which weigh upon the issue of the benefit or detriment of the child. Among those factors are the following:

(1) Harm to the child such as emotional injury, distrust, and possible confusion of knowing the parenting father is not the biological father;

(2) Protection of the child's physical, mental and emotional needs;

(3) The stability of the family relationship and extent of the intrusion that will result from a paternity determination;

(4) The consistency of the putative father's interest in the child;

(5) Societal stigma that may result or be perceived by establishing relationship, including placing the child's birth outside of the traditional wedlock setting;

(6) Continuity of established relationships;

(7) Any extent to which uncertainty of parentage already exists in the child's mind;

(8) The child's interest in knowing family and genetic background, including medical and emotional history.

[*Id.* at 429–430, 599 *A.*2d 1297.]

■ The court went on to state that the determination of the best interests of the child may commonly require that the court have the benefit of an independent investigation and opinion as to the child's best interest; and the family part judge, before proceeding with a best interests determination, whether it be on the papers or after a hearing, should consider whether appointment of a guardian ad litem is necessary. *Id.* at 430, 599 *A.2d* 1297.

■ This case differs from the ones above cited in that there the putative father challenged the paternity of the presumptive father. Here, the presumptive father is disclaiming his own paternity; however, the same principles apply. J.G.'s bare-bones statement that his eldest child told him at some point that he was not the younger child's father does not amount to articulable reason. The presumption of J.G.'s paternity has not been rebutted by clear and convincing evidence. No documentary submissions or testimony warrant the conclusion that the blood test is in the best interests of the child. The motion for a blood test is denied.

2. *Is complainant's motion barred by res judicata/collateral estoppel?*

■ Res judicata precludes a party or its privies from relitigating claims that were, or could have been, raised in a prior action; its mechanics require a final judgment by a court, and identity of parties, issues, and causes of action. *N.M. v. J.G., supra,* 255 *N.J.Super.* at 430–431, 605 *A.2d* 709. Collateral estoppel, a branch of res judicata, bars a party from relitigating issues which were actually litigated and determined in a prior case involving a different claim or action. The issue must have been fully and fairly litigated in the prior proceeding. *Id.* at 431, 605 *A.2d* 709; *Allesandra v. Gross,* 187 *N.J.Super.* 96, 105, 453 *A.2d* 904 (App.Div.1982).

■ Res judicata bars the divorce judgment from being relitigated; collateral estoppel does not, as the issue of paternity was not fully or fairly litigated in the divorce proceeding. Both

collateral estoppel and res judicata bar the April 24, 1985, and July 25, 1985 judgments of paternity from being relitigated. Those judgments resulted from hearings with the same parties as now and the same issues, namely paternity and support.

However, the court finds there are significant differences between the below cited cases in which res judicata or collateral estoppel barred reopening a paternity action and the present case, which, if other factors had been present, would have allowed the court to reopen the judgments of paternity and the divorce judgment, in spite of the procedural bars.

Generally, where res judicata or collateral estoppel barred paternity proceedings, the adjudication sought to be reopened was the result of disputed paternity claims. Here, there was an adjudication of paternity but the record does not reveal that paternity was ever disputed until now. At the time of the child's birth, the parties were not married; so in order to secure child support, the mother, as custodial parent, was obliged to seek a declaration of paternity. There is no indication that at the time of the paternity judgments or at the divorce J.G. had a claim that the child was not biologically his, and that such claim was resolved against him. Rather, he claims that he admitted paternity in the belief the child was his.

Fifteen years prior to the start of *Moore v. Hafeeza*, 212 *N.J.Super.* 399, 515 *A.*2d 271 (Ch.Div.1986), when HLA tests were not available, the mother had sued and obtained a blood test which revealed defendant was not the father. Subsequently, social services sued the defendant again on behalf of the mother, basing the argument for an HLA test on the grounds that at the time of the first action HLA testing was not available. The court decided that the mother was in privity with social services and that res judicata or collateral estoppel barred the action since the mother had fifteen years earlier enjoyed a full and fair opportunity to litigate the paternity issue. The court further stated that HLA tests had been available six years before the commencement of the later action; and during that six year period, the defendant, if he

was the father, had been denied a relationship with the child and had incurred other obligations. The action was thus barred by laches, as there had been an unexcusable delay in bringing on the second proceeding.

The distinction between *Moore v. Hafeeza, supra,* 212 *N.J.Super.* at 399, 515 *A.2d* 271, and the present case is that in the former the issue of paternity was actually disputed prior to the second proceeding that sought to reopen it. Here, there was no dispute, and no blood test or other evidence, apart from J.G.'s admission, was ever adduced to prove paternity.

In *E.I.B. by I.J. v. J.R.B.,* 259 *N.J.Super.* 99, 611 *A.2d* 662 (App.Div.1992), the grandmother brought a paternity action on behalf of the child. Earlier in 1975, the mother had brought a paternity action against the same defendant and there had been a trial before a jury which resulted in a finding that defendant was not the father. The Appellate Division, in ruling that the child's claim was barred by collateral estoppel, stated that the child, having been in privity with the mother in the earlier action, could not relitigate the same allegation and seek the same relief as was sought in the earlier action. Again, the distinction between this case and the present one is that in the former there was a dispute that was tried.

In *B.P. v. G.P.,* 222 *N.J.Super.* 101, 536 *A.2d* 271 (App.Div. 1987), a mother appealed the trial court's dismissal of her allegation that a man other than her ex-husband, from whom she was divorced in an uncontested proceeding, was the father of her child born during her marriage. The divorce judgment incorporated an agreement resolving child support and child custody and recited that the child was born of the marriage. The court held that res judicata did not bar the mother's action, even though a divorce judgment had been entered, as the paternity issue was not actually litigated in the divorce action.

The doctrines of res judicata and collateral estoppel by themselves would pose no bar to relitigating those judgments, if there was articulable reason to order a blood test, if the presumption of

J.G.'s paternity was rebutted by clear and convincing evidence, and if the blood test was in the best interests of the child, because of the distinctions between this case and the cases cited,—namely, that here no dispute about paternity was ever raised during the paternity hearings or the divorce.

3. *Should the paternity claim have been raised at the time of the divorce?*

C.R. claims that *N.J.S.A.* 9:17–46a of the Parentage Act mandates that any claim to deny paternity not joined at the time of the divorce is waived. The statute recites "... The action shall be joined with an action for divorce, annulment, separate maintenance or support."

The court does not interpret this language to mean that a paternity action not joined at the time of the divorce is waived. Rather, the statute means that if there is such a claim at the time of the divorce, it should be raised in the same action as the divorce rather than in a separate action.

*N.J.S.A.* 9:17—46a demonstrates a specific intent to have the issue of parentage dispute, *if known to the parties at the time,* (emphasis not in original) resolved during the divorce proceeding. *B.P. v. G.P.* 222 *N.J.Super.* 101, 106, 536 *A.*2d 271 (App.Div.1987). In that case, the mother knew at the time of the divorce that she had a claim that someone other than her husband, the presumptive father, had fathered her child; thus her paternity action against the putative father was barred. The distinction between that case and the present one is that there is no indication this complainant knew at the time of the divorce that he had a claim that another man had fathered the child. Thus the claim could not have been raised at the time of divorce.

*N.J.S.A.* 9:17–49a provides that the Parentage Act is governed by the civil rules of court. *R.* 4:27–1(b) provides that each party to an action "shall assert therein all claims which he may have against the other thereto insofar as may be required by application of the entire controversy doctrine." The single or

entire controversy doctrine is applicable to Parentage Act proceedings. *B.P. v. G.P., supra,* 222 *N.J.Super.* at 105, 536 *A.*2d 271. The doctrine as generally applied requires that a party who has elected to hold back from the first proceeding a related component of the controversy be barred from thereafter raising it in a subsequent proceeding. *Ibid.*

In this case, complainant is alleging that he did not know at the time of the 1985 judgments or the divorce that the child was not his; therefore he could not have raised the issue of paternity or elected to hold back what he did not know existed. J.G.'s motion is not barred by *N.J.S.A.* 9:17–46a or the entire controversy doctrine.

In *N.M. v. J.G.,* 255 *N.J.Super.* 423, 605 *A.*2d 709 (App.Div. 1992), plaintiff mother filed a complaint for support against defendant, alleging that he, rather than her ex-husband to whom she was married at the time of the birth, was the father of her child. The appeals court affirmed that the mother's complaint was barred by the entire controversy doctrine; it should have been joined with the divorce action. The appeals court did not discuss what knowledge the mother had at the time of the divorce. The fact pattern, however, makes it clear that the mother knew at the time of the divorce who the father of the child was. Six years before the time of the action, the mother told the child the defendant was really his father; and a few years after that she told the child that she had an extra marital affair with defendant resulting in his birth. In addition, common sense serves to inform us that a woman is more likely than a man to know the identity of her child's father.

4. *Is complainant equitably estopped from contesting paternity?*

C.R. alleges that due to the time that has transpired since the first child support and visitation order was entered in 1985, J.G. should be estopped from denying paternity and seeking relief from the child support orders. C.R. also argues that J.G. should be estopped from disclaiming his obligation to pay child support regardless of his biological relationship to the child because, since

the child's birth, J.G. has held himself out to be the child's father and obtained visitation orders for the child.

Equitable estoppel requires misrepresentation of material facts or concealment thereof, known to the party sought to be estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and upon which the other party reasonably and justifiably relies to its detriment. *Eileen T. Quigley, Inc. v. Miller Family Farms,* 266 *N.J.Super.* 283, 296, 629 *A.*2d 110 (App.Div.1993). Estoppel also arises when one party is led to change its position in reliance on the course of conduct followed by another, and in that case, the doctrine of estoppel will be applied to bar the second party from altering that conduct if, to do so, would prejudice the first party. *Connell v. American Funding,* 231 *N.J.Super.* 409, 416, 555 *A.*2d 745 (Ch.Div.1987). The burden of proof of a claim of equitable estoppel is on the party asserting it. *Miller v. Miller,* 97 *N.J.* 154, 163, 478 *A.*2d 351 (1984).

It is clear that when a man who knows he is not the biological father or has doubts thereof takes on the burden of a father, including support, and represents to the child and the community that he is the father, he may be estopped from disclaiming his responsibility to the child. *M.H.B. v. H.T.B.,* 100 *N.J.* 567, 498 *A.*2d 775 (1985); *Miller v. Miller, supra,* 97 *N.J.* at 154, 478 *A.*2d 351; *A.S. v. B.S.,* 139 *N.J.Super.* 366, 354 *A.*2d 100 (Ch.Div.1976); *Ross v. Ross,* 126 *N.J.Super.* 394, 314 *A.*2d 623 (Juv. and Dom.Rel.Ct.1973). If J.G., knowing he was not the father, represented to C.R. that he would take care of the child as if he were the father, the doctrine of equitable estoppel could be applied to bar his denial of paternity and support. It is also conceivable that a man could represent to a woman that he was the father of her child; and that the woman, not being sure of the father's identity but knowing there was a chance the man could be the father, could believe his representation of paternity. If that had happened in this case, J.G. could be estopped from disclaiming his paternity and support. At this time, the court does not

possess sufficient indication that either of these scenarios took place.

A defendant may not base a claim of estoppel in his favor on his own wrongful acts, or dereliction of duty, or on acts of plaintiff influenced by his conduct. *Erlich v. First National Bank of Princeton,* 208 *N.J.Super.* 264, 303, 505 *A.2d* 220 (Law Div. 1984). No person should profit by his own wrongdoing. *Jacobson v. Jacobson,* 146 *N.J.Super.* 491, 370 *A.2d* 65 (Ch.Div.1976). A prerequisite of equitable estoppel is good-faith reliance by one party on the conduct of another to the detriment of the relying party. *Plemmons v. New Jersey Automobile Full Insurance,* 263 *N.J.Super.* 151, 160, 622 *A.2d* 275 (App.Div.1993); *Lizak v. Faria,* 96 *N.J.* 482, 476 *A.2d* 1189 (1984). The doctrine of equitable estoppel is founded on fundamental principles of justice and good conscience. *O'Malley v. Department of Energy,* 212 *N.J.Super.* 114, 122, 514 *A.2d* 69 (App.Div.1986).

Therefore, if C.R. untruthfully represented to J.G. that he was the father of the child and if J.G., in the full belief of that representation, acted like a father, she cannot now employ equitable estoppel to claim he was guilty of a misrepresentation to her. J.G.'s claim is that he was the one to whom misrepresentations were made and who was deceived by those misrepresentations.

In *T.W. v. A.W.,* 224 *N.J.Super.* 675, 541 *A.2d* 265 (App.Div. 1988), the parties were divorced; there was a series of support orders, the man disputed paternity, there was a blood test which did not exclude the man as father; a paternity hearing was scheduled; as a result of that hearing, the man's paternity claim was dismissed with prejudice. The man shortly after moved to reduce support with no further mention of paternity then, or regarding later orders of support in 1977, 1978, and 1979. When the mother in 1985 applied for increased child support, paternity was again contested by the man. The trial court ordered an HLA test; the order was vacated and the man challenged the vacation.

The Appellate Division held the man's belated request for HLA testing was barred because the child, now 13, had considered him as her father her entire life; and the man's conduct estopped him from denying paternity. The court said the man had "apparent acquiescence in an adverse determination" for many years; that the issue was not only financial support for the child, but also an established parent-child relationship; that it was not in the child's best interests to now upset this, there being no other father figure; and that the man should have been diligent years ago in pursuing the matter. *Id.* at 683–685, 541 *A.2d* 265.

To reiterate, the court has no knowledge as to whether or not J.G. had "apparent acquiescence in an adverse determination" such as to render equitable estoppel a bar to his motion.

Similarly, a husband who found out three months after his wife had a child that the child was not his natural child, such knowledge being subsequently confirmed by a blood test, but who always represented himself to the child and the community as the child's father, sought custody of the child after his divorce from the mother and after the blood test, and who was the only father the child had ever known, was equitably estopped from denying child support. *M.H.B. v. H.T.B., supra,* 100 *N.J.* at 567, 498 *A.2d* 775. The Court stated that the husband's actions throughout the marriage and after the divorce "constituted a continuous course of conduct" towards the child that was tantamount to a knowing and affirmative representation that he would support her as would a natural father. *Id.* at 573, 498 *A.2d* 775.

This case differs from the one *sub judice* in that there a blood test was taken and estoppel was raised to prevent a party disclaiming support; here, estoppel is raised to prevent a blood test; however, the same principle applies. The party sought to be estopped must have knowledge that the facts are not as he has represented them to be. In *M.H.B. v. H.T.B., supra,* 100 *N.J.* at 567, 498 *A.2d* 775, the husband knew the child was not his from when the child was three months old. The court has insufficient

information on J.G.'s state of knowledge or his conduct sufficient to apply or not apply equitable estoppel to his motion.

### 5. *Is complainant judicially estopped from contesting paternity?*

Judicial estoppel, as distinguished from equitable estoppel, applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted; judicial estoppel looks to the connection between litigant and judicial system, while equitable estoppel focuses on the relationship between the parties to the prior litigation. *Cummings v. Bahr*, 295 *N.J.Super.* 374, 385, 685 *A.*2d 60 (App.Div.1996). The doctrine of judicial estoppel is designed to prevent litigants from "playing fast and loose" with the courts, *Id.* at 387, 685 *A.*2d 60, and to preserve judicial integrity by preventing a party from asserting inconsistent positions. *Levin v. Robinson*, 246 *N.J.Super.* 167, 180, 586 *A.*2d 1348 (Law Div.1990). Judicial estoppel is an equitable doctrine, applied only where there are present intentional inconsistencies, and not applied where doing so would work injustice. *Id.* at 184, 586 *A.*2d 1348. Thus it has been stated that the doctrine requires that the person sought to be estopped had a knowledge of the facts. *Chattin v. Cape May Greene*, 243 *N.J.Super.* 590, 620, 581 *A.*2d 91 (App.Div.1990), quoting *Brown v. Allied Plumbing & Heating*, 129 *N.J.L.* 442, 446, 30 *A.*2d 290 (Sup.Ct.1943).

Judicial estoppel may block a paternity suit. A mother's assertion of her husband's paternity in a divorce action and her pursuit of the husband for child support judicially estopped her paternity claim against the putative father. *N.M. v. J.G., supra,* 255 *N.J.Super.* at 429, 605 *A.*2d 709.

J.G.'s position differs from that of the mother in the above case in that the mother knew her husband was not the father; J.G.'s claim is that he did not know he was not the father at the crucial times of the adjudications. If this assertion had been proven to the satisfaction of the court, judicial estoppel would not be applied to deny his motion. J.G. could not be said to be "playing fast and loose" with the court because his statement in

the prior litigation would have been based on an ignorance of the facts and not an attempt at deception. As matters stand, the court has not enough information as to when J.G. began to think he was not the child's father, and cannot decide if judicial estoppel should apply to his motion.

6. *Is complainant barred by laches from contesting paternity?*

Where one knowing his rights takes no steps to enforce them, until the condition of the other party has in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes so inequitable and operates as an estoppel by laches against the assertion of those rights. *Notch View Associates v. Smith,* 260 *N.J.Super.* 190, 207, 615 *A.*2d 676 (Law Div.1992). The affirmative defense of laches is an equitable defense. A party asserting its application must show that the adversary without explanation or excuse delayed in asserting a claim now stale, that the delay was unreasonable under the circumstances and that it visited prejudice upon the party asserting the delay. *Berkeley Dev. v. Great Atlantic & Pacific Tea,* 214 *N.J.Super.* 227, 243, 518 *A.*2d 790 (Law Div.1986). Whether a claim is stale is based on whether a party had reason to assert the claim at an earlier date but has failed to do so. *Berkeley Dev. v. Great Atlantic & Pacific Tea,* 214 *N.J.Super.* 227, 243, 518 *A.*2d 790 (Law Div.1986).

Knowledge and delay are essential prerequisites to the application of the doctrine of laches. *Notch View Associates v. Smith,* 260 *N.J.Super.* at 207, 615 *A.*2d 676.

A party cannot have the benefit of laches when its own actions have caused the inequity or when it has contributed to or caused the delay. *Rolnick v. Rolnick,* 262 *N.J.Super.* 343, 364, 621 *A.*2d 37 (App.Div.1993).

A mother's claim for paternity and support was barred by laches, where the putative father promptly complied with a court order to take a blood test in a prior paternity proceeding, where

the mother failed to appear for the prior proceeding, removed the child from state while the paternity case was pending without seeking the court's permission, and the child grew to the age of nine with no opportunities for contact with the putative father. *State v. Volk*, 280 *N.J.Super.* 57, 60–61, 654 *A.*2d 500 (App.Div. 1995).

In *Moore v. Hafeeza, supra*, 212 *N.J.Super.* at 406, 515 *A.*2d 271, a mother's paternity claim was barred because for unexplained reasons she had done nothing for fifteen years to assert her claim, during which time the putative father had been denied the right to attempt to develop a relationship with the child and had incurred other obligations that would make it unfair to now burden him with supporting the child.

 The court will reiterate that J.G. could not have enforced rights that he did not know existed, and if the reason for his ignorance, if he was indeed ignorant, was that he was misled by C.R., she cannot plead laches. The court is still left with the question: after he knew, or rather, had reason to think he was not the child's father, how long did he wait before raising his claim? Was the delay unreasonable? Without such information, the court cannot make a decision on laches.

7. *Is complainant barred by R. 4:50–1?*

J.G. alleges fraud was practiced upon him and moves for relief from the paternity adjudications and the divorce judgment pursuant to *R.* 4:50–1(c), which allows relief from a final judgment or order for fraud, misrepresentation, or other misconduct of an adverse party. Such a motion must be made within a year of the entry of the final judgment or order, *R.* 4:50–2, thus J.G.'s time to plead fraud has passed. The only other ground upon which he can pursue his motion is *R.* 4:50–1(f), which allows relief from the operation of a final judgment or order for any other justifiable reason, i.e., any reason not listed in *R.* 4:50–1(a), (b), (c), (d), or (e).

Under *R.* 4:50–1(f), relief is available only when truly exceptional circumstances are present and when no other subsection of the rule applies. *Baumann v. Marinaro,* 95 *N.J.* 380, 395, 471 *A.2d* 395 (1984). Because *R.* 4:50–1(f) deals with exceptional circumstances, each case must be resolved on its own particular facts; no categorization can be made of the situations which would warrant redress under the rule, and strict bounds should never confine its scope. *Baumann v. Marinaro, supra,* 95 *N.J.* at 395, 471 *A.2d* 395. The purpose of the rule is to afford relief when enforcement of a judgment would be unjust, oppressive, or inequitable. *Moore v. Hafeeza, supra,* 212 *N.J.Super.* at 407, 515 *A.2d* 271.

A motion under *R.* 4:50–1 is addressed to the sound discretion of the trial court, which should be guided by equitable principles in determining whether relief should be granted or denied. *Housing Authority of Town of Morristown v. Little,* 135 *N.J.* 274, 283, 639 *A.2d* 286 (1994); *Rosen v. Rosen,* 225 *N.J.Super.* 33, 37, 541 *A.2d* 716 (App.Div.1988).

The factors to be considered in deciding whether relief from final judgments should be granted under *R.* 4:50–1(f) include the extent of the delay in making the application for relief, the underlying reason or cause, fault or blamelessness of the litigant, and any prejudice that would accrue to the other party. *Parker v. Marcus,* 281 *N.J.Super.* 589, 593, 658 *A.2d* 1326 (App.Div.1995). In some instances, the difference between *R.* 4:50–1(c), which names fraud as a reason for relief, and *R.* 4:50–1(f), which reads "any reason justifying relief" have been blurred; nonetheless, the cases are instructive.

Where a party applied, pursuant to *R.* 4:50–1(f), for a substantive modification of a negotiated equitable distribution scheme, such an application was held to require a showing of fraud, misconduct or mistaken negotiation, or a showing of fundamental inequity or unfairness in the agreement. *Connor v. Connor,* 254 *N.J.Super.* 591, 601, 604 *A.2d* 158 (App.Div.1992); see *Capuzzo v. Capuzzo,* 244 *N.J.Super.* 317, 582 *A.2d* 815 (App.Div.1990). If it is

shown that a spouse committed fraud or misconduct by failing to disclose the true worth of his or her assets, *R.* 4:50–1(f) may allow relief from judgment if the motion is made within a reasonable time. *Rosen v. Rosen, supra,* 225 *N.J.Super.* at 37, 541 *A.*2d 716.

In *Marussich v. Marussich,* 207 *N.J.Super.* 163, 504 *A.*2d 63 (Ch.Div.1985), a wife was found entitled to have default judgments in a paternity action against her husband by another woman set aside, where the court in the paternity action had not been made aware that the husband had three children by his wife when it determined child support for the other woman's child. *Id.* at 167–168, 504 *A.*2d 63.

Whether relief under *R.* 4:50–1(f) should be granted depends upon the date when the applicant discovered the facts underlying its claim, so that it may be determined if the claim was made within a reasonable time. *Palko v. Palko,* 73 *N.J.* 395, 375 *A.*2d 625 (1977); see *In the Matter of the Estate of Fanny Green,* 175 *N.J.Super.* 595, 421 *A.*2d 600 (App.Div.1980).

The boundaries of *R.* 4:50–1(f) are as expansive as needed to achieve equity and justice. *Morales v. Santiago,* 217 *N.J.Super.* 496, 526 *A.*2d 266 (App.Div.1987). The function of the rule is to enable the court to consider whether values of equity and fairness may, in given circumstances, supersede the finality of the prior adjudication. *Matter of Wehrhane's Estate,* 149 *N.J.Super.* 41, 372 *A.*2d 1365 (Ch.Div.1977).

In accordance with the need to achieve equity and fairness, which is the intent of *R.* 4:50–1, the court holds that to be uncertain if one's child is indeed one's child, to be deceived in the matter, together with the concomitant need to ascertain the facts of one's own parenthood, and the injustice of being left in ignorance of it, constitute exceptional circumstances that justify relief from the operation of a final judgment or order. To suffer misgivings or apprehensions in such a fundamental and crucial aspect of one's life as whether one is a parent or not, an aspect which, due to scientific advances, can now be established with

almost complete certainty (*See Moore v. Hafeeza, supra,* 212 *N.J.Super.* at 401, 515 *A.*2d 271, and *Malvasi v. Malvasi,* 167 *N.J.Super.* 513, 401 *A.*2d 279 (Ch.Div.1979)) and not to be allowed to discover the truth, presents an inequity and an injustice that may, in the proper case, be allowed to override final judgments or orders.

The Supreme Court has stated that a court typically vacates a judgment, because events have risen to alter the substantive rights of the parties or because the relief granted did not adequately take into account the prevailing equities. *Housing Authority of Town of Morristown v. Little, supra,* 135 *N.J.* at 289, 639 *A.*2d 286. If the court which issued the final judgments of paternity based its decision on an untruth, it certainly would have failed to adequately address the prevailing equities. But, as has been stated above, this court does not have enough information on which to base any vacations of judgments.

8. *Conclusion*

Complainant's motion is denied, because the presumption of paternity has not been rebutted, articulable reason to suspect complainant is not the father has not been presented, and how a blood test would impact the best interests of the child has not been addressed.

The court concludes that J.G. remains and always has been the father of the child and as such must support his child. If the child is still in Columbia, as represented by C.R. during the January 26, 1996 proceeding and by J.G. in his certification, which assertion has not been denied by C.R., the court orders that the child be returned to C.R.'s custody in the United States within thirty days of the order.

If the order is not complied with, C.R. will forfeit support for the child, as she passed responsibility for the child from herself to another, without the other person obtaining legal custody, and without the consent of J.G., the acknowledged father of the child.