results in "a determination of rights with respect to, the assets of" the failed institution. 12 *U.S.C.A.* § 1821(d)(13)(D)(i). Additionally, a recoupment would reduce or extinguish an asset held by the receiver and, as persuasively argued by the RTC, would elevate defendants' claim above other creditors and claimants who have submitted to FIRREA's administrative procedure. We hesitate to apply an equitable principle, such as recoupment, when its application clashes with the orderly and fair administration of the affairs of a failed institution as detailed by the federal statutory scheme. The counterclaim for recoupment must therefore, at least in the context before us, be deemed a "claim" subject to the federal administrative procedure.

Reversed and remanded for the entry of an order dismissing defendants' counterclaim.

599 A.2d 1297
M.F., PLAINTIFF–RESPONDENT, v. N.H.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 6, 1991—Decided December 17, 1991.

Before Judges PRESSLER, SHEBELL and D'ANNUNZIO.

*Loveland, Garrett, Russell & Young,* attorneys for appellant (*Richard A. Russell* and *Joanne Mazza Weber,* on the brief and reply brief).

*Carmen R. Faia,* attorney for respondent.

The opinion of the court was delivered by

SHEBELL, J.A.D.

This is a case of first impression in this State. It involves the question of whether a man, alleging himself to be the father of a child conceived of an adulterous relationship and born during wedlock, may over the objection of the mother and her husband maintain an action and obtain blood tests for the purpose of establishing his paternity of the child under the New Jersey Parentage Act (Parentage Act) (*N.J.S.A.* 9:17–38 to 9:17–59).

On March 21, 1991, plaintiff M.F. filed a verified complaint in the Family Part, alleging that he "believes that he may be the father of the child," A.H., the infant daughter of the defendant-mother N.H. Plaintiff alleged that "since the birth of the baby [on August 31, 1990], [he] has periodically visited the child at the residence of the defendant." He requested reasonable visitation with A.H. "in the event the paternity test determines he is the father of the child." Plaintiff also filed a Notice of Motion to Compel Paternity Testing, returnable on April 26, 1991, to compel blood testing and requested *pendente lite* visitation pending the outcome of blood tests.

The defendant filed an answer on April 11, 1990, raising the following separate defenses:

1. Defendant is lawfully married to [J.H.] and was so at the time of the conception and birth of the child in question, which child is presumed by law to be born of said marriage, because of which plaintiff has no standing upon which to maintain a cause of action herein.

2. Plaintiff has failed to state a claim upon which relief may be granted.

In his certification in support of his application to compel visitation and blood testing, plaintiff stated that, although defendant is married to another man, plaintiff, nonetheless, since September 1986 had been engaging in sexual intercourse with her "an average of one to two times per week." He contended that:

[he] had previously advised [N.H.] when she was pregnant that if I was the father of the child I intended to act as the father of the child, assist in it's support and to have regularly scheduled visitation with the child. I also advised her that I intended to seek paternity blood testing. I waited until the child was approximately six months old, upon the advice of my attorney, who advised that the child should be at least six months old before blood testing is administered.

... I have kept in communication with [N.H.] since the child's birth. I have spoken to her about the baby, how the child is doing, and about the child's health. I have also made it a point to periodically visit the child, at least once per month at the home of [N.H.].

Both defendant and her husband J.H. filed answering certifications dated April 22, 1991, acknowledging their marriage, that they continue to live together, and that, as evidenced by the birth certificate, J.H. acknowledges A.H. as his daughter.[1]

On April 26, 1991, the Family Part judge entered an order compelling defendant and her daughter to submit to paternity testing, but denying plaintiff's request for visitation. Defendant did not appear for the blood test scheduled for May 15, 1991; however, on that date, her attorney filed a "notice of motion for leave to appeal from order of April 26, 1991, and for stay of blood testing pending appeal." In connection with the motions for a stay in the Family Part, both plaintiff and defendant filed certifications that revealed deterioration of their

---

[1]It does not appear from the record on appeal that defendant's husband, the presumptive father under *N.J.S.A.* 9:17-43a(1), was joined or attempted to join as a party in this action.

prior relationship. Defendant alleged that plaintiff was attempting to destroy her marriage.

The Family Part judge refused to grant a stay of blood tests but prohibited "disclosure of test results pending Appellate action[;]" however, he ordered that the parties refrain from contact with each other and restrained them from discussing the litigation. We granted defendant's motion for leave to appeal and entered a stay of the order for blood tests. We now reverse the order to compel blood testing and remand for further proceedings.

■ We do not agree with the conclusion of the Family Part judge that he was required under the provisions of *N.J.S.A.* 9:17–51 to compel blood testing. Section 51a states that "upon request of a party *in any contested case* brought under P.L.1983, c. 17 (C. 9:17–38 *et seq.*) [the court] *shall,* require the child, mother, and alleged father to submit to blood tests or genetic tests." (Emphasis added). We are convinced that an action does not rise to the level of a "contested case" until it has been judicially so designated after there has been either a consent conference pursuant to *N.J.S.A.* 9:17–48, a preliminary hearing, or other judicial review resulting in findings as to the appropriateness and validity of the paternity complaint filed. *See S.S. v. E.S.,* 243 *N.J.Super.* 1, 13, 578 *A.*2d 381 (App.Div. 1990), *aff'd o.b.,* 124 *N.J.* 391, 590 *A.*2d 1188 (1991).

■ We conclude for purposes of this opinion that plaintiff, as one "alleging himself to be the father" of A.H., has standing, pursuant to *N.J.S.A.* 9:17–45, to commence an action "for the purpose of determining the existence or nonexistence of the parent and child relationship." We recognize that there is merit in the contrary view that New Jersey's enactment of the Uniform Parentage Act (UPA), even with our Legislature's drastic modification of the UPA's provision as to the parties who may maintain an action, does not provide conclusive evidence of an intent to permit an action by a putative father claiming to have had an adulterous relationship with a woman, whose husband acknowledges the child to be his own.

This is particularly so in light of the strong public policy favoring the preserving of the family unit when neither the mother nor her husband have in any way disavowed the husband's paternity of the child. *See Michael H. v. Gerald D.*, 491 *U.S.* 110, 124, 109 *S.Ct.* 2333, 2342, 105 *L.Ed.*2d 91, 106 (1989), wherein the Supreme Court emphasized, "[i]n fact, quite to the contrary, our traditions have protected the marital family . . . against the sort of claim . . . assert[ed]," and upheld the constitutionality of a California statute that did not permit a putative father even to attempt to rebut the presumption that a child born to a married woman living with her husband is a child of the marriage, after concluding that the putative father in an adulterous relationship does not have a constitutionally-protected liberty interest in establishing biological fatherhood.

The New Jersey statute, unlike the California statute considered in *Michael H.*, expressly accords standing to any man "alleging himself to be the father." *N.J.S.A.* 9:17–45. Therefore, we are constrained to conclude that this plaintiff has the right under the Parentage Act to file a complaint. We are, however, satisfied that mere standing does not ensure that the action may proceed and that blood tests may be ordered.

We base our analysis first on *N.J.S.A.* 9:17–43(a)(1), which creates the presumption that the mother's husband is the father of a child born in wedlock.[2] *N.J.S.A.* 9:17–43(a)(2) to (a)(6), inclusive, establish presumptions of paternity based on enumerated circumstances other than birth of the child in wedlock. None of these presumptions, however, is applicable here. Were there any presumption in favor of plaintiff's paternity, we would then be guided by *N.J.S.A.* 9:17–43(b), which instructs that:

---

[2]*N.J.S.A.* 9:17–43a provides:

A man is presumed to be the natural father of a child if:

(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment or divorce. . . .

If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls.

In the absence of a competing presumption, we are persuaded that something more must be demonstrated, beyond the mere assertion of paternity, before plaintiff may be permitted to intrude upon the existing relationships between the mother, her husband, and their child. Thus, the question we must answer is what preliminary showing plaintiff must make before being permitted the opportunity of rebutting the weighty presumption of the paternity of the mother's husband.

In dealing with this issue, we rely on Justice Handler's reminder in *Adoption of a Child of Indian Heritage*, 111 *N.J.* 155, 173, 543 *A.*2d 925 (1988), that even an undisputed natural father who was not married to the mother at the time of the child's birth is not automatically entitled to claim parental status merely on the basis of the biological connection. Hence, as Justice Handler explained:

"... [p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." ... Therefore states may constitutionally deny an unwed father parental status unless and until he manifests an interest in developing a relationship with that child, provided that the qualifications for establishing such rights are not beyond the control of an interested putative father to satisfy.... Following the Court's decision in *Stanley* [*Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972)] many states adopted statutes defining the circumstances under which a man would be presumed to be a child's father and thus entitled to due process in any proceeding involving the child. [*Id.* at 174 [543 *A.*2d 925] (citations omitted)].[3]

■ We have considered the constitutionally permissible limitations on the rights of unwed natural fathers in the light the

---

[3]Although *Indian Child* was decided prior to *Michael H*, we find nothing in the Supreme Court's plurality decision detracting from the validity of Justice Handler's observations. We further note that the import of Justice Brennan's dissent in *Michael H.* was his perception that a constitutionally protected interest attaches to the natural father of a child born in wedlock who has already developed a paternal relationship with the child. *See also* Traci Dallas,

presumption of the paternity of the mother's husband, the strength of that presumption, the fact that the mother's husband here has acknowledged the child, and the fact that there is no statutory presumption of paternity in favor of this plaintiff. Based on these factors, we have concluded that before this action may proceed and before blood tests may be ordered, the trial court must make a finding, on appropriate proofs, that establishment of plaintiff's paternity and the rebuttal of the husband's paternity will serve the best interests of the child.

The best-interests test in similar situations has already been employed in other jurisdictions. In *McDaniels v. Carlson*, 108 *Wash.*2d 299, 738 *P.*2d 254 (1987), the Washington Supreme Court explored "[w]hat role do public policy and the best interests of the child [standard] play in the allowance of paternity actions brought under the ... UPA." *Id.* 738 *P.*2d at 257. The court undertook its clarification of this issue in response to appellant's argument that "public policy favors accurate paternity determinations even to the detriment of family unity and harmony." *Id.* 738 *P.*2d at 260.

The Washington court recognized, as do we, that:

A paternity suit, by its very nature, threatens the stability of the child's world. We are concerned that the best interests of the child standard, too broadly interpreted, could become a blanket license for any person to disrupt long-fostered family relationships by claiming to be the parent of a child. It may be true that a child's interests are generally served by accurate, as opposed to inaccurate or stipulated, paternity determinations.... However, it is possible that in some circumstances a child's interests will be even better served by no paternity determination at all. *See, e.g.,* RCW 26.33.330 (mandating permanent sealing of adoption files except *for good cause shown*). The best interests of the child standard does not entitle a court to presume that paternity determination is *automatically* in the child's best interest. [*Id.* [738 *P.*2d] at 261 (citation omitted) ].

The court in *McDaniels* continued:

Therefore, absent a showing that such determination is in fact within the child's best interests, this standard cannot be invoked on behalf of someone other than the child.

---

Note, "Rebutting the Marital Presumption: A Developed Relationship Test," 88 *Colum.L.Rev.* 369 (1988).

. . . .

We contemplate that in some circumstances the rights of the child will be better served by maintaining a stable family relationship than by allowing a paternity action. Where someone outside the family files a paternity action, the trial judge should consider the impact upon the child in deciding whether the action may proceed. This determination must depend on the particular circumstances of the case and needs of the implicated child. [*Id.* [738 *P.*2d] at 261–62 (citation omitted)].

Thus, the Washington Supreme Court directed its trial courts to consider, before permitting a paternity action such as presented here to continue, such factors as "the stability of the present home environment, the existence or lack thereof of an ongoing family unit, the extent to which uncertainty of parentage already exists in the child's mind, and any other factors which may be relevant in assessing the potential benefit or detriment to the child." *Id.* 738 *P.*2d at 262.

An Arizona appellate court, building on the Washington Court's rationale in *McDaniels* held, notwithstanding its own determination that the Arizona statute permits actions to establish the paternity of a child, whether or not a child is born out-of-wedlock, "that the trial court must specifically consider whether it would be in the best interests of the child for the case to proceed before a putative father may be permitted to seek blood tests in an attempt to rebut the presumption of the husband's paternity." *Ban v. Quigley*, 168 *Ariz.* 196, 812 *P.*2d 1014, 1017 (App.1990).

The Arizona court noted that the Massachusetts Supreme Judicial Court adopted a similar test in considering whether a man who alleges he is the father of a child can bring a paternity action where the mother is married to another man. *Id.* (citing *C.C. v. A.B.*, 406 *Mass.* 679, 550 *N.E.*2d 365 (1990)). The Arizona court cited the factors that the Massachusetts court directed its trial courts to apply in making an evaluation to determine whether "a substantial parent-child relationship" existed; specifically including,

"emotional bonds, economic support, custody of the child, the extent of personal association, the commitment of the putative father to attending to the child's

needs, the consistency of the putative father's expressed interest, the child's name, the names listed on the birth certificate, and any other factors which bear on the nature of the alleged parent-child relationship." [*Id.* [812 *P.*2d] at 1017–18 (quoting *C.C. v. A.B.*, 550 *N.E.*2d at 372) ].

Significantly, the Kansas Supreme Court in *Marriage of Ross*, 245 *Kan.* 591, 783 *P.*2d 331 (1989) observed that "[o]nce the judge, in the interest of judicial economy, ruptures the father/child relationship, the judge cannot return the parties to the position they were in prior to the blood test, no matter how wise or great his or her judicial power." *Id.* 783 *P.*2d at 338. The Kansas court in concluding that the trial court erred in failing to inquire whether it would be in the child's best interests to allow the paternity action to proceed, stated:

Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child, including physical, mental, and emotional needs. The shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child. Although someone may suffer, it should never be the child, who is totally innocent and who has no control over or conception of the environment into which he or she has been placed. [*Id.* [783 *P.*2d] at 338–39 (citation omitted) ].

We hold that the court may not order blood tests or permit the action to continue where the plaintiff's claim of paternity conflicts with the presumption established in *N.J.S.A.* 9:17–43a(1), unless the court determines by clear and convincing evidence that it is in the best interests of the child. *See Paternity of C.A.S.*, 161 *Wis.*2d 1015, 468 *N.W.*2d 719, 727–29 (1991) (holding that ordering a determination of paternity at the request of a putative father, where mother was married to another man, was not in the best interests of the child).

The Family Part's determination of the child's best interests must be based upon a consideration of all of the factors which weigh upon the issue of the benefit or detriment of the child. Among these factors are the following:

(1) Harm to the child such as emotional injury, distrust, and possible confusion of knowing the parenting father is not the biological father;

(2) Protection of the child's physical, mental, and emotional needs;

(3) The stability of the family relationship and extent of the intrusion that will result from a paternity determination;

(4) The consistency of the putative father's interest in the child;

(5) Societal stigma that may result or be perceived by establishing relationship, including placing the child's birth outside of the traditional wedlock setting;

(6) Continuity of established relationships;

(7) Any extent to which uncertainty of parentage already exists in the child's mind;

(8) The child's interest in knowing family and genetic background, including medical and emotional history.

Further, the determination of the best interests of the child may commonly require that the court have the benefit of an independent investigation and opinion as to the child's best interests. The Family Part judge, before proceeding with a best interests determination, whether it be on the papers or after a hearing as the case may require, should consider whether appointment of a guardian *ad litem* is necessary. *R.* 4:26–2(b)(4); *see Marriage of Ross,* 783 *P.*2d at 336.

Reversed and remanded.