757 A.2d 319 (2000)
334 N.J. Super. 177
MONMOUTH COUNTY DIVISION OF SOCIAL SERVICES and S.B., Plaintiffs,
v.
R.K., Defendant.
Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County.
Decided June 1, 2000.
*321 Patrick J. Boyle, for plaintiff, Monmouth County Division of Social Services (Thomas H. Klein, attorneys).
Gerard L. Del Tufo, for plaintiff, S.B.
Tracey M. Doyle, Rahway, for defendant (Stephen Steinberg, P.C., attorneys).
*320 LOCASCIO, J.S.C.
Will a man be required to continue to pay child support, which he has been obligated to pay for 10 years, based upon a voluntary admission of paternity signed within 10 months of the child's birth, where he has been the only "father" the child, who bears his name, has ever known, despite genetic tests, administered 10 years after the birth, which exclude him and the mother's husband as the biological father? This court, applying the doctrine of equitable estoppel, answers this question, of first impression, in the affirmative.
Three months after S.B.'s marriage to W.B., on May 18, 1985, her first child was born. Three years later, on June 13, 1988, S.B. met R.K., and the two began an extramarital affair, engaging in sexual relations between September and December 1988. When, in February 1989, S.B. learned that she was pregnant, R.K. wanted her to have an abortion because they were both living at home and because S.B. was still married to W.B. The parties agreed not to tell anyone of the pregnancy. On Valentine's Day, 1989, R.K. told S.B. that due to a childhood groin injury, he did not think he could produce children. However, on May 18, 1989, after hernia surgery, R.K. learned that, although he had a low sperm count, it was possible for him to impregnate a woman. On June 1, 1989, R.K. moved in with S.B.
When T.K. was born, on July 9, 1989, R.K. was present at the delivery and wanted his name on the bassinet and birth certificate. W.B., S.B.'s husband, and therefore the presumptive father of T.K., (N.J.S.A. 9:17-43(a)(1)), went to the hospital to consent to R.K. being listed as the father. S.B. and W.B. were divorced on December 7, 1989 without any provision for T.K. S.B. and R.K. continued to live together until September 1994, during which time R.K. would leave for one month periods, and then return. However, because the relationship between S.B. and R.K. was a rocky one, when T.K. was five years old, R.K. left and did not return.
On March 27, 1990, the Monmouth County Division of Social Services (hereinafter "MCDSS") filed a complaint for support and paternity against both R.K. and W.B. Because R.K. signed an admission of paternity and a consent order on May 4, 1990, agreeing to pay $105 per week child support, the complaint against W.B. was dismissed. S.B. continued to receive support on behalf of T.K. through Aid to Families with Dependant Children (AFDC), now known as Temporary Assistance for Needy Families (hereinafter "TANF"), 42 U.S.C. 654(4) and (5); N.J.S.A. 44:10-55 et seq., until January 1, 1991. Because the parties had reconciled, and T.K. was no longer receiving support, on June 4, 1991, MCDSS filed an order making the case arrears only. On May 28, 1992, the arrears were paid in full; therefore an order was filed by MCDSS closing the case.
Because S.B. received TANF support, on behalf of T.K., again from May 1, 1993 until September 1, 1993, and from November 1, 1994 to September 1, 1995, on May 15, 1995, MCDSS filed a complaint for support against R.K. On June 30, 1995, R.K. consented to an order of forty nine dollars per week child support, plus five dollars per week toward arrears. On December 17, 1997, a judgment was entered *322 against S.B. and R.K., in favor of MCDSS, in the amount of $2,038.64.
In March 1999, when S.B. filed a motion to increase child support, R.K. filed a cross-motion for increased visitation. These motions were resolved by an August 9, 1999 consent order, whereby the parties, without the consent of MCDSS, agreed:
(1) to submit to genetic testing,
(2) that neither party would leave New Jersey with the child, for more that two weeks, without the consent of the other,
(3) that the parties would be equally responsible for the MCDSS $2,038.64 judgment,
(4) that R.K. would pay eighty dollars per week child support,
(5) that the parties would have joint legal custody of T.K.,
(6) that the parties would equally share T.K.'s unreimbursed medical expenses,
(7) to alternate T.K.'s income tax exemption, and
(8) that R.K. would have "overnight parenting time two nights every week, (Wednesday and Thursday, unless modified [sic] mutual agreement) ... every other weekend overnight Friday to Monday morning, two weeks vacation, telephone contact and additional time upon consent."
Because genetic testing, performed on October 4, 1999, excluded R.K. as the biological father of T.K., on December 27, 1999 R.K. filed the within motion seeking to modify the August 9, 1999 consent order as follows:
(1) to terminate his obligation to support T.K.,
(2) for reimbursement of support previously paid,
(3) to terminate his obligation with respect to the MCDSS judgment,
(4) to continue his joint legal custody, and his shared parenting arrangement,
(5) to permit T.K. to participate, as R.K.'s best man, in R.K.'s upcoming wedding and to accompany R.K. and his new wife on their honeymoon to Disney World, and
(6) for counsel fees.
At a March 22, 2000 plenary hearing R.K. withdrew his motion (2) for reimbursement of support previously paid, and (3) to terminate his obligation with respect to the MCDSS judgment, and S.B. consented to R.K.'s motion with respect to (5) T.K. participating in R.K.'s wedding and accompanying R.K. and his new wife on their Disney World honeymoon.
S.B.'s cross-motion sought:
(1) to deny R.K.'s motion,
(2) to require R.K. to pay for any counseling that T.K. may need regarding the issue of paternity, and
(3) for counsel fees.
Prior to the plenary hearing, W.B., S.B.'s husband at the time of T.K.'s birth, agreed to a genetic test which, on March 6, 2000, excluded W.B. from paternity.
At the plenary hearing R.K. conceded that:
(1) the question of his being the father of T.K. was always in the back of his mind,
(2) he held himself out as T.K.'s father since the child's birth, which relationship R.K. does not want to change,
(3) R.K. and his fiancé love T.K. a great deal (the fiancé feels as if T.K. were her own son),
(4) when R.K. revealed to T.K. that he was not T.K.'s biological father, he promised T.K. that nothing would change as a result of the genetic testing. R.K. used the expression "24/7," meaning that he was available for T.K. 24 hours a day, 7 days a week, and
(5) both R.K. and his fiancé feel that if they were suddenly out of T.K.'s life,
*323 they and T.K. would all be heartbroken.
Although R.K. contended that S.B. slept with four other men, who might be T.K.'s biological father, which S.B. denied, the unrebutted evidence indicated that none of those relationships occurred prior to 1994. In fact, the evidence indicated that between the birth of her first child, on August 17, 1985, and the birth of T.K., on July 9, 1989, S.B. had sexual relations with only her husband and R.K. At most, S.B. recalled that, after seeing a picture of R.K. with another woman, she went on a drinking binge one night in October or November 1988. However, S.B. could not, at the plenary hearing eleven and one half years thereafter, account for her activities on that night, had no recollection of having sex with anyone, and certainly, if she did, did not know the identity of such person.
A relationship between a child and the natural father may be established by a certificate of parentage, i.e.:
in accordance with section 331 of Pub.L. 104-193, a signed voluntary acknowledgment of paternity shall be considered a legal finding of paternity subject to the right of the signatory to rescind the acknowledgment within 60 days of the date of signing, or by the date of establishment of a support order to which the signatory is a party, whichever is earlier.
[N.J.S.A. 9:17-41(b) (emphasis added).]
Because there is a court order of paternity in the present case, as well as a signed, sworn admission of paternity, the issue of paternity, as adjudicated, can only be voided "upon a finding that there exists clear and convincing evidence of fraud, duress or a material mistake of fact, with the burden of proof upon the challenger...." N.J.S.A. 9:17-41(b). In support of this burden of proof, R.K. offers the results of a genetic test, which excludes him as the biological father of T.K.
It should be noted that had S.B. and R.K. not signed the August 9, 1999 consent order agreeing to the paternity test, but instead, R .K., after ten years, sought a court order for a genetic test, his request, in all likelihood, would have been denied because, prior to ordering a genetic test to establish paternity, there must be a finding that such an order would "serve[ ] the best interests of the child." See A.K. v. S.K., 264 N.J.Super. 79, 624 A.2d 36 (App. Div.1993), M.F. v. N.H., 252 N.J.Super. 420, 599 A.2d 1297 (App.Div.1991); T.W. v. A.W., 224 N.J.Super. 675, 541 A.2d 265 (App.Div.1988); C.R. v. J.G., 306 N.J.Super. 214, 703 A.2d 385 (Ch.Div.1997); and Jensen v. Jensen, 13 N.J.Super. 155, 80 A.2d 244 (Ch.Div.1951).
In M.F. v. N.H., supra, a man claimed to be the father of a child born to a woman who was married to another man. 252 N.J.Super. at 423, 599 A.2d 1297. The mother's husband acknowledged that the child was his. Ibid. Therefore, there was a presumption of paternity in favor of the husband. Id. at 426-27, 599 A.2d 1297; see also N.J.S.A. 9:17-43(a). In reversing the lower court's decision to order a blood test, the court held that "the court may not order blood tests or permit the action to continue where the plaintiff's claim of paternity conflicts with the presumption established in N.J.S.A. 9:17-43a(1), unless the court determines by clear and convincing evidence that it is in the best interest of the child."[1]Id. at 429, 599 A.2d 1297.
*324 In the case at hand, at the time of the genetic test, there was a presumption of paternity by virtue of the signed May 4, 1990 admission of paternity, the consent order agreeing to pay child support, and the fact that, for five years, R.K. lived with T.K., openly holding T.K. out as his child. N.J.S.A. 9:17-43(a)(4), (5) and (6). Therefore, in order for a court to consider and order a paternity test, R.K. would have to demonstrate clear and convincing evidence not only of fraud, duress, or material mistake of fact, but also that such a test would have been in T.K.'s best interest. Nonetheless, without the consent of MCDSS, or a ruling by the court, the parties voluntarily agreed to participate in a genetic test, the results of which exclude R.K. as the father of T.K. Therefore, arguably, R.K. has presented clear and convincing evidence that there was a material mistake of fact relied upon at the time his paternity was adjudicatedthat mistake being that he was the biological father of T.K. As a result, this court could void the original adjudication of paternity. Notwithstanding, this court holds that R.K. is equitably estopped from denying his paternity because to do otherwise would not be in the best interests of T.K.
Equitable estoppel is a doctrine that has received wide use and acceptance in family matters similar to the one at hand. See M.H.B. v. H.T.B., 100 N.J. 567, 498 A.2d 775 (1985); Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984); A.K. v. S.K., 264 N.J.Super. 79, 624 A.2d 36 (App.Div. 1993); M.F. v. N.H., supra; Savoie v. Savoie, 245 N.J.Super. 1, 583 A.2d 762 (App.Div.1990); C.R. v. J.G., supra; A.S. v. B.S., 139 N.J.Super. 366, 354 A.2d 100 (Ch.Div.1976), aff'd o.b., 150 N.J.Super. 122, 374 A.2d 1259 (App.Div.1977); Ross v. Ross, 126 N.J.Super. 394, 314 A.2d 623 (J. & D.R.Ct.1973); Jensen v. Jensen, supra. Traditionally, equitable estoppel requires "representation, reliance, and detriment." Miller, supra, 97 N.J. at 167, 478 A.2d 351 (1984). It arises "when one party is led to change its position in reliance on the course of conduct followed by another, and in that case, the doctrine of estoppel will be applied to bar the second party from altering that conduct if, to do so, would prejudice the first party." C.R. v. J.G., supra, 306 N.J.Super. at 235, 703 A.2d 385 (citing Connell v. American Funding, 231 N.J.Super. 409, 416, 555 A.2d 745 (Ch.Div. 1987)).
Equitable estoppel has been used to estop a party from denying child support, where he has voluntarily acted in loco parentis to the child. See Savoie v. Savoie, supra, 245 N.J.Super. 1, 583 A.2d 762 (App.Div.1990) (grandfather estopped from denying support to his grandchild, where he stood in loco parentis to that child from three days after the child was born, and where both natural parents were incapable of caring for the child due to severe mental illness); A.S. v. B.S., 139 N.J.Super. 366, 354 A.2d 100 (Ch.Div.1976), aff'd o.b., 150 N.J.Super. 122, 374 A.2d 1259 (App.Div. 1977) (ex-husband estopped from denying child support, where parties had voluntarily taken child in at the age of one month and raised him as their own for 12 years); Ross v. Ross, 126 N.J.Super. 394, 314 A.2d 623 (J. & D.R.Ct.1973) (party estopped from repudiating his paternity, where he voluntarily assumed role of father after marrying child's mother and filed a certificate of admission of paternity with the Bureau of Vital Statistics).
*325 In Ross, supra, 126 N.J.Super. at 395-96, 314 A.2d 623, a child was born to the wife 18 months prior to her marriage to defendant. Even though both knew defendant was not the biological father of the child, during the course of the marriage defendant filed a certificate of admission of paternity with the Bureau of Vital Statistics, and the school records reflected defendant as the father. Id. at 396, 314 A.2d 623. Because the child, at the time of the hearing, was 7 years old and believed defendant to be his father, and defendant, by his conduct, represented himself to be the father, the court estopped him from denying his paternity because to do otherwise "would do irreparable harm and inflict deep injury upon the child." Id. at 396-97, 314 A.2d 623.
In both A.S. v. B.S. and Savoie, the court reasoned that, by voluntarily assuming the obligation of supporting the child, the parties prevented the child from knowing his natural parents and from being adopted. See A.S. v. B.S., supra, 139 N.J.Super, at 371-72, 354 A.2d 100; Savoie, supra, 245 N.J.Super. at 5, 583 A.2d 762. In both cases, the child's natural parents were unavailabale. See A.S. v. B.S., supra, 139 N.J.Super. at 371, 354 A.2d 100, Savoie, supra, 245 N.J.Super. at 3, 583 A.2d 762. Thus equitable estoppel was applied from the viewpoint of the childthe child relied upon the voluntary actions of the partiesand to allow the parties to repudiate their obligation would cause irreparable harm to the child, leaving the child without support, i.e. "[t]he essential principle of the policy of estoppel here involved is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and good faith has relied upon such conduct." A.S. v. B.S., supra, 139 N.J.Super. at 372, 354 A.2d 100 (quoting Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 117 A.2d 585 (1955)).
Equitable estoppel has also been applied to deny a party a genetic test. See A.K. v. S.K., 264 N.J.Super. 79, 624 A.2d 36 (App. Div.1993); M.F. v. N.H., 252 N.J.Super. 420, 599 A.2d 1297 (App.Div.1991) (denying putative father's request for a blood test, where mother was married to another man at the time of conception and birth, and where husband acknowledged paternity); Jensen v. Jensen, 13 N.J.Super. 155, 80 A.2d 244 (Ch.Div.1951) (denying blood test, where husband abandoned challenge to paternity at time of divorce, and the judgment determined that the child in question was born of the marriage).
In A.K. v. S.K., supra, the parties were married in 1975. 264 N.J.Super. at 81, 624 A. 2d 36. Although the parties initially had difficulties conceiving children, because the husband had been treated with radiation and chemotherapy, three children were eventually conceived. Ibid. When the parties were divorced in 1988, the property settlement agreement provided for joint legal custody of the children. Id. at 83, 624 A.2d 36. Following the divorce, the ex-husband made at least two applications for physical custody of the children. Ibid. In fact, at one point, the parties shared joint physical custody of the children. Id. at 84, 624 A.2d 36.
The court found that to allow husband to repudiate paternity, because of the wife's alleged extramarital affair, would leave the children without support. Id. at 89, 624 A.2d 36. Relying upon the decisions in Savoie, supra; A.S. v. B.S., supra; and Ross, supra, the court, in denying husband's request for HLA blood testing, held that "the doctrine of equitable estoppel therefore prohibits defendant from now seeking to avoid his support obligation on the grounds that he is not the father." Id. at 90, 624 A.2d 36.
The doctrine of equitable estoppel has also been employed to obligate a stepfather to support a child after his divorce from the child's mother. Miller, supra, 97 N.J. at 170, 478 A.2d 351. In Miller, the mother had two children born of a previous marriage. Id. at 159, 478 A.2d 351. The natural father continued to support *326 his children after the couple divorced, until he was imprisoned on drug charges. Id. at 160, 478 A.2d 351. While the natural father was imprisoned, the mother remarried and the stepfather took on the role of father to the children, supporting them financially and emotionally. Ibid. When the natural father was released from prison, he attempted to again support his children by sending support checks. Ibid. However, because the stepfather was concerned that the monies were derived through illegal means, he refused to accept the support payments and objected to the children visiting their natural father. Id. at 161, 478 A.2d 351.
The Miller Court distinguished the stepfather's role because at least one natural parent was present, and the other "while absent, may still be available." Id. at 166, 478 A.2d 351. The court enunciated two tests, based upon equitable estoppel, for determining whether a stepfather should be obligated to pay support (1) pendente lite and (2) permanently. Id. at 167, 478 A.2d 351. (1) Pendente lite support requires a showing that "the stepparent's conduct actively interfered with the children's support by their natural parent, so that pendente lite support may not be obtained from the natural parent...." Ibid. (2) To obligate a stepfather to pay permanent child support the natural parent must demonstrate "representation, reliance, and detriment," i.e. "that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support." Id. at 168-69, 478 A.2d 351.
The Miller test was applied in M.H.B. v. H.T.B., supra, where, three months following the birth of their third child, K.B., the husband read his wife's diary and learned that he might not be that child's natural father. 100 N.J. at 569, 498 A.2d 775. Over the course of the three years following his move out of the marital home, husband continued to maintain a close bond with all three children. Ibid. (Handler, J. concurring). Meanwhile, the mother, for six months, moved in with K.B.'s purported natural father, while K.B. was aware of no father other than husband. Id. at 569-70, 498 A.2d 775 (Handler, J., concurring). When husband and wife's attempted reconciliation failed, they eventually divorced. Ibid. In a written settlement agreement, husband not only stipulated to paternity, but subsequently sought custody of all three children. Id. at 570-71, 498 A.2d 775 (Handler, J., concurring). Only when wife cross-moved for an increase in child support, during one of husband's petitions for custody, did husband attempt to repudiate his paternity of K.B. Id. (Handler, J., concurring). Subsequently, wife consented to a blood test, the results of which excluded husband as the biological father of K.B. Ibid.
The decision of the trial judge,[2] who relied upon the doctrine of equitable estoppel to preclude husband from repudiating his paternity, was affirmed by a divided court. Id. at 568, 498 A.2d 775 (Handler, J., concurring). Although all justices agreed that husband was obligated to support K.B. pendente lite, id. at 577, n. 1, 498 A.2d 775. (Handler, J., concurring), they disagreed as to whether that obligation should be permanent. Id. at 584, 498 A.2d 775 (Pollock, J., concurring in part and dissenting in part).
Justice Handler's concurring opinion concluded that "[a]pplying the principles set forth in Miller, the evidence in this case compels the imposition of equitable estoppel to prevent [husband] from denying the duty to provide financial support *327 for K.B.," because there was reasonable reliance upon husband's affirmative representation that he was K.B.'s natural father. Id. at 573, 498 A.2d 775 (Handler, J. concurring). Therefore, husband had established a psychological parent-child relationship with K.B.; the effect of which was to "stultif[y] the development of any other filial relationship between K.B. and anyone else," id. at 574, 498 A.2d 775 (Handler, J., concurring), and therefore K.B. would "suffer demonstrable harm" if husband were permitted to repudiate his parental role. Id. at 575, 498 A.2d 775 (Handler, J., concurring).
Justice Pollock rendered a separate opinion criticizing Justice Handler's purported use of the Miller test. Id. at 582, 498 A.2d 775 (Pollock, J., concurring in part and dissenting in part). Justice Pollock emphasized the requirement, under Miller, that there be active interference with the child's support from the natural father (tearing up natural father's support checks), whereas in M.H.B., the natural father had made no claims for, nor attempted to support, K.B. Id. at 582, 498 A.2d 775 (Pollock, J., concurring in part and dissenting in part). In fact, Justice Pollock found that, because the natural father was as culpable as husband for his failure to financially support his child, husband could not have actively interfered, and "a stepparent is responsible for the unavailability of a natural parent only when he or she takes `positive action interfering with the natural parent's support obligation.' " Id. at 583, 498 A.2d 775 (Pollock, J., concurring in part, dissenting in part) (quoting Miller, supra, 97 N.J. at 170, 478 A.2d 351). Therefore, Justice Pollock "would not alter Miller`s requirement that when the natural parent can be located and is financially able, he or she remains principally responsible to pay permanent child support." Id. at 583-84, 498 A.2d 775 (Pollock, J., concurring in part, dissenting in part) (citing Miller, 97 N.J. at 169, 478 A.2d 351).
In the case sub judice, there is only one available natural parentthe mother. However, unlike Miller and M.H.B., the putative father in the present case was never married to the child's mother, and thus has not acted as a stepfather to the child. Additionally, and most importantly, the biological father in this case has not been, and cannot be, located.
In spite of these distinctions, this court holds that the Miller test is applicable to the within matter, i.e. where the biological father is unknown and the only "father" available is a psychological father. Although the Miller case involved a stepparent situation, a broader reading of the case indicates that it applies where there is one natural parent and the other "while absent, may still be available." Miller, supra at 166, 478 A.2d 351. Although R.K. has not acted as a stepfather because the parties were never married, he has acted as, and this court holds that he is, a psychological parent to T.K.
The issue of psychological parentage has recently been addressed in V.C. v. M.J.B., 163 N.J. 200, 205, 748 A.2d 539 (2000), where the lesbian partner of the biological mother sought visitation based upon the fact that she was a "psychological parent." In that case, the issue of psychological parentage was affirmatively asserted, whereas in the present case, it is being asserted defensively. However, whether being asserted as a sword or a shield, the test enunciated must be the same when determining whether a party has been a "psychological parent" to a child:
the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged.

[Id. at 223, 748 A.2d 539.]
In the instant matter, S.B., the natural mother, clearly consented to and *328 fostered R.K.'s role as T.K.'s father. R.K. has shared joint legal custody of T.K.; in earlier years R.K. lived with T.K. on and off for five years, and more recently has enjoyed an abundance of visitation. R.K. has acted as a father to T.K. in every waycaring for and teaching him as a father would. Most importantly, there is a very strong bond between the two that cannot be, and has not been, denied. The two are so close that T.K. is going to be R.K.'s best man at his upcoming wedding, and is going with R.K. on his Disney World honeymoon. There is no doubt that R.K. has accepted the role of fatherhood, and wishes to maintain that role despite his present application to stop paying child support. Hence, the V.C. test is clearly met, and R.K. is a psychological parent to T.K. because:
[a]t the heart of the psychological parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them. That interest, for constitutional as well as social purposes, lies in the emotional bonds that develop between family members as a result of shared daily life.
[Id. at 221, 703 A.2d 385 (citing Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14, 35 (1977)).]
Although R.K. is a psychological father, he is not a biological father. Therefore, his role is akin to that of a stepparent, and the Miller test is applicable.
This brings to the forefront the crucial distinction between the case sub judice and prior case law. Whereas the natural father was known in both Miller and M.H.B., here he is not known. S.B. does not recall sleeping with any men other than R.K. and her husband at the critical time of conception. At most, S.B. recalls having a drinking binge, at which time she might have had sexual relations with some unknown man. The critical question then, and one of first impression, is whether the prong of the Miller test that requires "active" interference must be met where the biological father is unknown.
Certainly when the Miller Court fashioned its test, it envisioned an affirmative act that interfered with attempts by the biological father to provide support. See Miller, supra, 97 N.J. at 170, 478 A.2d 351. As Justice Pollock pointed out in M.H.B., this is not possible when the natural father has not made any attempts to support the child. See M.H.B., supra, 100 N.J. at 584, 498 A.2d 775 (Pollock, J., concurring in part and dissenting in part). On the other hand, Justice Handler found such interference in the stepfather's preventing the child from creating a relationship with the natural father:
I am satisfied, as was the trial court, that the evidence in this case establishes that Henry, from the time of K.B.'s birth, engaged in a voluntary and knowing course of conduct with respect to K.B., which constituted in its purpose and effect an affirmative representation that he was her natural father.
[Id. at 576, 498 A.2d 775 (Handler, J., concurring).]
In this changing society, where more and more children are being born out-of-wedlock, and there is a continuing need to find support for these children, this court holds that the Miller test must be interpreted to apply equitable estoppel where the biological father is unknown. A careful review of Justice Pollock's opinion in M.H.B., supports this proposition. Justice Pollock indicated only that he would not alter the Miller test when the natural parent is available. Id. 583-84, 498 A.2d 775 (Pollock, J. concurring in part and dissenting in part). It can be inferred, therefore, that he would alter it where the natural parent is unknown and cannot be located.
In many ways, the case sub judice, is more similar to the cases of Savoie, supra, and A.S. v. B.S., supra, although in those cases neither natural parent was available.
*329 The concerns in those cases were the same as the concerns herecausing irreparable harm to the child and leaving the child without support. See A.S. v. B.S., supra, 139 N.J.Super. at 371-72, 354 A.2d 100, Savoie, supra, 245 N.J.Super. at 5, 583 A.2d 762.
Of course, it is true that "the natural parent should always be considered the primary recourse for child support because society and its current laws assume that the natural parent will support his or her child." Miller, supra, 97 N.J. at 169, 478 A.2d 351; see also M.H.B., supra, 100 N.J. at 579, 498 A.2d 775 (Handler, J., concurring). However, this must be considered in conjunction with the policy against leaving a child without a father to provide emotional and financial support. See A.K. v. S.K., supra, 264 N.J.Super. at 90, 624 A.2d 36; Savoie v. Savoie, supra, 245 N.J.Super. at 5, 583 A.2d 762; A.S. v. B.S., supra, 139 N.J.Super. at 371-72, 354 A.2d 100; Ross v. Ross, supra, 126 N.J.Super. at 400, 314 A.2d 623. It is also undisputed that, in any determination regarding parentage, the child's best interest must always remain in the forefront. See Matter of Baby M., 109 N.J. 396, 445, 537 A.2d 1227 (1988); M.H.B., supra, 100 N.J. at 578, 498 A.2d 775 (discussing the provisions of N.J.S.A. 9:17-53c, which allows the court to include in any judgment or order regarding paternity, any matter that is "in the bests interests of the child.").
There is something innately wrong with the proposition that a person can voluntarily assume the role of a parent, not just tending to a child's needs, but actually asserting parentage of that child, for more than ten years, and yet maintain the ability to repudiate that paternity, leaving a child fatherless and without support. The fact that R.K. did not know for certain, at the time paternity was adjudicated, that he was the father of T.K., distinguishes the within matter from the stepparent scenario or the facts of Savoie, supra, A.K. v. S.K., supra, and Ross, supra. However, although R.K. was not certain, and in fact may have believed that he was T.K.'s natural father, he had reasons to doubt this and to contest his paternity. When R.K. was engaged in an extramarital affair with S.B., he believed that, as the result of a childhood groin injury, he was incapable of impregnating a woman, and the question of his being the father of T.K. was always in the back of his mind. MCDSS brought paternity complaints against R.K. and W.B., S.B.'s husband at the time. Although W.B. was the presumptive father, rather than question his paternity, R.K. stepped forward and proclaimed that he was the father. Only now, ten years later, in the face of a motion to increase child support, does R.K. question his paternity.
[t]here is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm.
[M.H.B., supra, 100 N.J. at 576, 498 A.2d 775 (Handler, J., concurring) (quoting Clevenger v. Clevenger, 189 Cal.App.2d 658, 11 Cal.Rptr. 707, 710 (Dist.Ct.App.1961)).]
It could be argued that R.K. has waived his right to contest paternity. Waiver "is the intentional surrender or abandonment of a known right, operative unilaterally and without regard to reliance by others...." Mattia v. Northern Ins. Co. of New York, 35 N.J.Super. 503, 511, 114 A.2d 582 (App.Div.1955). However, because it is the natural parent's primary responsibility to support his child, and to impose such liability upon another is recognized as "exceptional," M.H.B., supra 100 N.J. at 579, 498 A.2d 775 (Handler, J., concurring), the courts have considered reliance by, and detriment to, the child tantamount to a decision regarding paternity.
Because "our judicial system has long acknowledged that `courts are capable *330 of dealing with the realities, not simply the legalities, of relationships' and have adjusted the rights and duties of parties in relation to that reality," V.C. v. M.J.B., supra, 163 N.J. at 233, 748 A.2d 539 (Long, J., concurring) (quoting Dunphy v. Gregor, 136 N.J. 99, 111, 642 A.2d 372 (1994)), this court holds that in addition to representation and reliance, the Miller test may be satisfied when there is "passive" interference with an unknown biological father's ability to support a child, where the following four elements are present:
(1) a party, other than the biological parent, voluntarily accepts paternity for a significant period of time, thereby becoming a psychological parent;
(2) the biological parent cannot be located due to the passage of time and because he was not pursued earlier due to the psychological parent's voluntary acknowledgment of paternity;
(3) the psychological parent, at the time of acknowledgment, had reason to question his paternity; and
(4) the child would be financially and emotionally harmed if the psychological parent were allowed to repudiate his paternity.
R.K. is equitably estopped from denying his paternity of T.K. because his conduct the aforesaid test.
Representation and Reliance:
R.K. represented that he was the father of T.K. R.K. was present at the birth of T.K. on July 9, 1989, and his name appears on the birth certificate. T.K. bears R.K.'s surname. On May 4, 1990, based upon R.K.'s signed admission of paternity, acknowledging that he is the father of T.K, an order of filiation was entered which set R.K.'s child support obligation at $105 per week. In the August 9, 1999 consent order, the parties agreed to submit to genetic testing, to have joint legal custody, to equally share responsibility for the $2,038.68 MCDSS judgment and all unreimbursed medical expenses of T.K., to alternate T.K.'s income tax exemption, that neither party would take T.K. outside New Jersey without the consent of the other, that R.K. would pay eighty dollars per week child support, and that R.K.'s visitation would be increased to two over-nights during the week, as well as every other weekend. T.K. calls R.K. "dad," and R.K. admits to having a very strong bond with T.K., using the term "24/7," meaning he is available for T.K. twenty four hours a day, seven days a week.
Because S.B. is not financially independent and relies upon R.K.'s support, MCDSS has been involved in this case since March 1990. According to the child support guidelines worksheet attached to the August 9, 1999 consent order, S.B. earns $225 per week and R.K. earns $789 per week. S.B. received public assistance for T.K. from July 9, 1989 to January 1, 1991; from May 1, 1993 to September 1, 1993, and from November 1, 1994 to September 1, 1995. Therefore, it is clear that both S.B. and T.K. have relied upon, and continue to rely upon, R.K.'s financial support. Moreover, T.K. relies upon R.K.'s emotional support. T.K. has a very close bond with R.K. and R.K.'s fiancé who loves T.K. as if he were her own child. R.K. wishes to maintain joint legal custody and his liberal shared parenting arrangement.
Therefore, this court finds that R.K. has, in every way, represented himself as T.K.'s father, and T.K. and S.B. have relied upon that representation.
"Passive Interference":
(1) R.K. has voluntarily accepted paternity of T.K. for the past ten years, during half of which he resided, on and off, with S.B. and T.K., and has always been available "24/7" for T.K. R.K. and T.K. have a bond that is so strong that T.K. is going to be R.K.'s best man at his upcoming wedding and is going on R.K.'s Disney World honeymoon. R.K. is, therefore, unquestionably T.K.'s psychological father.
(2) R.K.'s actions, in voluntarily acknowledging his paternity of T.K., prevented *331 further inquiry into the identity of T.K.'s biological father. Over ten years ago, R.K. acknowledged his paternity of T.K., even in the face of a complaint against W.B., the presumptive father. On May 4, 1990 an order of filiation was entered, resulting in a dismissal of the complaint against W.B., thereby ending any search to identify the biological father of T.K. Certainly, had R.K. challenged paternity at that time, MCDSS would have persevered in its efforts to discover the identity of the biological father. S.B. can now only recall that one night during October or November 1988 she went on a drinking binge, and might have had sex with some unknown male. If, in 1990, it had been discovered that, neither R.K. nor W.B. was the biological father of T.K., other individuals could have been questioned, perhaps even those who were present with S.B. during her drinking binge. However, now, ten years later, because of R.K.'s voluntary acknowledgment of paternity, it is impossible to determine who might be the biological father of T.K.
(3.) R.K. had reason, at the time he acknowledged his paternity, to question the paternity of T.K. R.K. was aware that he had suffered a childhood groin injury, which he believed made it impossible for him to produce children. However, approximately two months prior to T.K.'s birth, R.K. learned that although he had a low sperm count, it was possible for him to impregnate a woman. Because R.K. was having an affair with a married woman, the question of his being the father of T.K. was always in the back of his mind. Therefore, R.K. was aware of facts, at the time he acknowledged paternity, and the order of filiation was entered, that gave him reason to question his paternity. In spite of this knowledge, R.K. accepted the role of being T.K.'s father both financially and emotionally.
(4.) T.K. would be financially and emotionally harmed if R.K. were allowed to now repudiate his paternity. Over the past 10 years S.B. has found it necessary to receive public assistance on several occasions which demonstrates that T.K. has been financially reliant upon R.K. T.K.'s natural father is unknown at this time, and it is highly doubtful that he will ever be known. To allow R.K. to stop supporting T.K. would leave T.K. with only the minimal support from his mother and public assistance. R.K. concedes that to terminate R.K.'s parental obligation would be devastating to T.K., i.e. T.K. would be emotionally harmed. R.K. and his fiancé love T.K. T.K. knows no father other than R.K., and R.K. does not want this to change. When R.K. informed T.K. of the results of the genetic test, R.K. promised T.K. that nothing would change.
Studies have demonstrated the importance, in child development, of the presence of two parents:
[i]n general, relationships with parents play a crucial role in shaping children's social, emotional, personal and cognitive development, and there is a substantial literature documenting the adverse effects of disrupted parent-child relationships on children's development and adjustment (Lamb, 1999, Hwang, Ketterlinus, & Fracasso, 1999). The evidence further shows that children who are deprived of meaningful relationships with one of their parents are at greater risk psychosocially, even when they are able to maintain relationships with the other of their parents. Stated differently, there is substantial evidence that children are more likely to attain their psychological potential when they are able to develop and maintain meaningful relationships with both of their parents, whether or not the two parents live together.
Joan B. Kelly & Michael E. Lamb, Using Child Development Research to Make Appropriate Custody and Access Decisions, 38 Fam. and Conciliation Courts Rev., in press (July 2000).
In today's quick paced, complex society, each child needs a fatherto provide love and affection, to provide emotional and *332 financial support, to aid in decision making, to teach the child how to fish, catch a baseball, or hit a tennis ball, to explain, after disappointments, that although life is not always fair, we must always try our best and be fair in our dealings with others, and to teach the child that courage is "... not the absence of fear but the ability to carry on with dignity in spite of it." SCOTT TUROW, THE BURDEN OF PROOF 491 (1990). A father cannot pick and choose some of the aforesaid responsibilities; it is not in the best interests of the child. The child needs a complete father, not one half or one fifth of a father. Being a father is at times difficult, at times expensive, at times fun, and always time consuming. R.K. has indicated that although the paternity test has established that he is not the biological father, and therefore contends that he should not have a financial obligation toward T.K., he would be "available" for T.K. if he needs him. Indeed, regardless of this court's decision, R.K. intends to have T.K. as his best man at his upcoming wedding and to bring T.K. on his Disney World honeymoon. Although commendable, a court would be remiss to permit a father to have only the fun times, but not the difficult times. R.K. cannot have it both ways.
R.K. has always been T.K.'s psychological father. Unfortunately, based upon the facts of this case, if R.K. is determined not to be T.K.'s psychological father, T.K. will be fatherless. Because of the bond that presently exists between T.K. and R.K., such a situation cannot and must not be countenanced by this court. T.K.'s best interests, therefore, require this court to equitably estop R.K. from repudiating his paternity.
For the aforesaid reasons, this court determines that R.K. is, and shall continue to be, the psychological father of T.K. in all respects: emotional, financial, and educational. Therefore, R.K.'s motion to terminate his support obligation is denied, but his motion to continue joint legal custody and his present parenting arrangement is granted. Because R.K. revealed the results of the paternity test to T.K., S.B.'s cross-motion, to require R.K. to pay for any counseling needed by T.K. to deal with the paternity issue, is granted. Because these motions created an issue of first impression, both motions for counsel fees are denied.
NOTES
[1] The M.F. v. N.H. Court provided a list of factors to consider in determining the child's best interest:

1. Harm to the child such as emotional injury, distrust, and possible confusion of knowing the parenting father is not the biological father;
2. Protection of the child's physical, mental, and emotional needs;
3. The stability of the family relationship and extent of the intrusion that will result from a paternity determination;
4. The consistency of the putative father's interest in the child;
5. Societal stigma that may result or be perceived by establishing [sic] relationship, including placing the child's birth outside of the traditional wedlock setting;
6. Continuity of established relationships;
7. Any extent to which uncertainty of parentage already exists in the child's mind;
8. The child's interest in knowing family and genetic background, including medical and emotional history.
[M.F. v. N.H., supra, 252 N.J.Super. at 429-30, 599 A.2d 1297; see also C.R. v. J.G., supra 306 N.J.Super. at 229, 703 A.2d 385.]
[2] The trial court found that:

Henry intended to be K.B.'s father and ... she relied on that fact ... Henry is certainly K.B.'s psychological, if not biological parent... Henry is the only father K.B. knows or has ever known ... to permit Henry now to repudiate his intent to support K.B. ... would cause irreparable harm to the child. [M.H.B. v. H.T.B., 100 N.J. at 572, 498 A.2d 775.]